**Edgar J. WILLIAMS, Jr., Plaintiff-Appellant,**

v.

**AVONDALE SHIPYARDS, INC., Defendant-Appellee.**

No. 30158.

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1971.

Rehearings Denied Nov. 3, 1971.

Roy F. Amedee, Jr., New Orleans, La., for plaintiff-appellant.

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Thomas L. Jones, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., Robert M. Contois, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, and WISDOM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

During a final sea trial run of the USCG Cutter Hamilton prior to its delivery to the United States Coast Guard,

Edgar J. Williams either slipped on an oil spot or became engaged in a fist-fight.[1] In whichever manner, he injured his right index finger and brought this suit seeking $225,000.00 plus $20,000.00 for maintenance and cure, and attorney fees from the United States[2] and from his employer, Avondale Shipyards (Shipbuilder). Agreeing with the District Court that Williams was not a member of a crew of a vessel in navigation within the meaning of the Jones Act, and that he was not entitled to a warranty of seaworthiness from the vessel on which the injury occurred, but concluding that the Judge went too far too fast to sustain a summary judgment upholding the exclusiveness of the Longshoremen's and Harbor Workers' Compensation Act, we must vacate the judgment and remand for further proceedings on the count for general maritime negligence.

Williams worked for Shipbuilder as an engineering draftsman during 1966 and 1967. At that time Shipbuilder was engaged in construction of USCGC Hamilton, a new vessel being built for the United States Coast Guard. The contract called for sea trials. In January of 1967 Williams was assigned to go aboard Hamilton for approximately two days to serve as a data-taker and gauge monitor during final sea trials of the vessel. Shipbuilder's crew was aboard. It was during this trial run that his injuries were sustained. A month later, after additional construction activities and procedures were carried out, the Hamil-

ton was delivered to and accepted by the United States Coast Guard.[3]

Three theories are asserted against Shipbuilder. We reject two, but the third requires a remand for further development of the pertinent facts.

### I. Warranty of Seaworthiness

Williams' first claim is that Avondale breached its warranty of seaworthiness by manning the Hamilton with an insufficient and inadequately trained crew which allowed a slippery condition to develop and exist.

Without even deciding whether Williams was a member of the crew or whether he was a blue water, paper or *Sieracki* seaman or whether the condition complained of was an unseaworthy one, we disallow this claim because at the time of Williams' injuries, no warranty of seaworthiness was owed to anyone. The whole purpose of the sea trial was to ascertain what additional work would be required to make the Hamilton fully fit. Shipbuilder could, of course, be held to due care to those properly aboard, but that is a far cry from the awesome obligations of seaworthiness. At this stage of construction, no one was holding forth to any persons going aboard the vessel that she was in fact completed, fit and seaworthy. That was precisely what the trial run was intended to determine.

Thus Williams cannot prevail on a warranty of seaworthiness theory. See Rogers v. M/V Ralph Bollinger, 279 F.Supp.

---

1. The pleadings of the parties are in conflict as to just how the injury occurred. The complaint had all the vagueness that the Rules permit. In the pretrial order, Williams specified oil as the cause of the injury. Shipbuilder, to the contrary, answered that Williams injured his hand in a fistfight when he struck a pipe instead of a jaw. Since this appeal is from dismissal of the complaint without any evidence or trial, we assume that the Plaintiff's specifications are true.

2. The United States was dismissed from the suit upon a successful pleading of the

two-year Statute of Limitations. 46 U.S.C.A. § .745. No appeal is taken from that action and the Government is no longer a party to this lawsuit.

3. She must have been a beautiful ship— 378 feet long, manned by a crew of 15 officers and 149 enlisted personnel. She was even the subject of a magazine article, auspiciously entitled, "The USCGC HAMILTON (WHEC–715) Coast Guard Ship of the Future," by Captain Edward F. Oliver, USCG, but the Court has been unable to ascertain whether or where the article was published.

92 (E.D.La.1968); Alfred v. M/V Margaret Lykes, 5 Cir., 1968, 398 F.2d 684.[4]

## II. Jones Act

■■■ Williams next seeks benefits under the Jones Act, 46 U.S.C.A. § 688.

"There are three essential elements in the term 'seaman' as used in the Jones Act. First, the vessel on which the claimant is employed must be in navigation. Second, there must be more or less permanent connection with the vessel, and third, the claimant must be aboard primarily to aid in navigation. McKie v. Diamond Marine Co., 5 Cir., 1953, 204 F.2d 132." Bodden v. Coordinated Caribbean Transport, Inc., 5 Cir., 1966, 369 F.2d 273, 274.

As to the first of those three elements, we hold that Hamilton was not "in navigation" as that term has been defined by the courts at the time of Williams' injuries. It is true that Hamilton was at sea and underweigh at that time, but "it is fallacious to assume that whenever a tort occurs on navigable waters, the person injured will automatically avail himself of the Jones Act." Frankel v. Bethlehem-Fairfield Shipyard, 4 Cir., 1942, 132 F.2d 634, 635.

The term "in navigation" means "engaged in an instrument of commerce and transportation on navigable waters." Norris, Law of Seamen, § 664, p. 802;

Carumbo v. Cape Cod S.S. Co., 1 Cir., 1941, 123 F.2d 991. And for a public non-merchant vessel, that would mean engaged in her expected duties as a vessel on navigable waters. The test for determining this is "the status of the ship." West v. United States, 1959, 361 U.S. 118, 122, 80 S.Ct. 189, 192, 4 L.Ed. 2d 161, 165, 1959 A.M.C. 1602, 1606.

A shipbuilder's worker, construction hand or engineer assisting in the building and ultimate commissioning of a launched but uncompleted vessel floating or maneuvering in navigable waters is not a seaman within the meaning of the Jones Act, because his vessel is not yet an instrumentality of commerce—private or public—and is therefore not "in navigation." Frankel v. Bethlehem-Fairfield Shipyard, *supra;* Rogers v. M/V Ralph Bollinger, *supra.*[5]

For there to be a seaman, there must first be a ship. And an incompleted vessel not yet delivered by the builder is not such a ship. Ship and seaman, ship and seaworthiness are mutual reflexes.

## III. General Maritime Negligence

■■ Williams' final theory is that he is entitled to recover on general maritime principles.

Of course, the tort of which Williams complains is a classic case of a maritime injury, since it occurred and the injuries

---

4. See also, Roper v. United States, 1961, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1, 1961 A.M.C. —— esp. n. 3; Johnson v. Oil Transport Co., Inc., 5 Cir., 1971, 440 F.2d 109 [No. 28418, March 12, 1971]; Stark v. United States, 5 Cir., 1969, 413 F.2d 253, 1969 A.M.C. ——; Desper v. Starved Rock Ferry Co., 1952, 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205, 1952 A.M.C. 12.

These cases all involved vessels which had been withdrawn from navigation, but the principle is pertinent where the vessel has not yet entered navigation.

5. Our holding here would seem to follow the rationale enunciated in *Frankel* and quoted favorably in *Rogers:*

"Accordingly, since a contract for the building of a ship is non-maritime in character, a tort arising out of work on a launched but incompleted vessel also lacks maritime flavor, despite the fact that the vessel is lying in navigable waters. Furthermore, an incompleted vessel has yet to take her place in commerce and navigation; whereas a vessel which has been commissioned and taken into navigation and commerce remains in that status even when coming into a dock and undergoing certain repairs."

132 F.2d at 635.

In this approach, much emphasis has been laid on the historical tradition that vessels under construction give rise to neither a maritime contract nor a maritime tort. But for the Longshoremen's Act, that is no longer controlling. See, Calbeck v. Travelers Ins. Co., 1962, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368, 1962 A.M.C. 1413. But it does not alter our holding.

were consummated on navigable waters. And to this action, it does not matter whether those navigable waters are those of the United States or of all nations as international waters.

Likewise, from the standpoint of substantive principles it is the maritime law of the United States which, at least in an action involving its own nationals and a vessel [6] of the United States, is applicable. Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, 1959 A.M.C. 597.[7] To this extent the maritime law is global.

As a matter of pleadings there can be no doubt about the maritime claim. The allegations of Williams' complaint twice specify that the accident occurred while Hamilton was "upon the navigable waters of the United States." At another point however, it alleged the vessel was on navigable waters in the Gulf of Mexico: "The USCG HAMILTON * * * was undergoing ocean tests in the Gulf of Mexico."

All this seems to have been well known to the Trial Court, for his first impression led him to refuse to dismiss the maritime negligence claim at the time he dismissed the Jones Act and unseaworthiness counts. But, of course, what

faced him was something different. For Shipbuilder subsequently moved for summary judgment based on the fact that since Williams was unquestionably an employee, his exclusive remedy against his employer is under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 905.

The trouble was that there was not a stitch of proof—one way or another—on the crucial jurisdictional [8] question of coverage of the Act. Unlike the Jones Act or a claim for unseaworthiness or general maritime law the Longshoremen's Act is limited to the "navigable waters *of the United States.*" (emphasis added). 33 U.S.C.A. § 903.[9]

Thus, the propriety of dismissing this action because of the exclusiveness of [10] the compensation remedy depends upon a finding that Hamilton was in navigable waters of the United States at the time of the injury.

Again as a matter of pleadings, the unverified motion of Shipbuilder stating merely that the Longshoremen's Act controlled stood denied by operation of the rules since no reply was called for. It is true that twice the complaint spoke in conclusory terms of "navigable waters of the United States," but there was the other allegation that the situs was the

---

6. For this purpose the "vessel" need not be in navigation. Maritime jurisdiction depends on the injury on waters, not the status of the floating craft or device. See, e. g., Weinstein v. Eastern Airlines, Inc., 3 Cir., 1962, 316 F.2d 758; Death on the High Seas by Wrongful Act, 46 U.S.C.A. §§ 761–768.

7. See also Massey v. Williams-McWilliams, Inc., 5 Cir., 1969, 414 F.2d 675, 1959 A.M.C. ——; Stark v. United States, *supra*; Johnson v. Oil Transport, *supra* [No. 28418, March 12, 1971]; Cates v. United States, 5 Cir., 1971, 451 F.2d 411.

8. See South Chicago Coal & Dock Co. v. Bassett, 7 Cir., 1939, 104 F.2d 522, aff'd, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732.

9. "Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry

dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." 33 U.S.C.A. § 903.

10. For an employer who has qualified under the Act, Section 905 provides:
   "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death * * *."

   Cf. Reed v. Steamship Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, 1963 A.M.C. 1373; Jackson v. Lykes Bros. S.S. Co., 1967, 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488, 1967 A.M.C. 584.

Gulf of Mexico, with no indication of how far out into the Gulf the vessel had ventured. Here for the Court to resolve this basic question on pleadings of this character was a sort of reverse of Barber v. Motor Vessel "Blue Cat", 5 Cir., 1967, 372 F.2d 626, 1967 A.M.C. —— and Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. Instead of reading too little, as is most often the cause of the soaring mortality rate of Rule 12(b) dismissals, the Judge read too much into the pleadings.

We do not mean to expound here a technical literalness so foreign to the Admiralty. But the legal question is serious and may well turn on specific territorial facts. Cf. O'Loughlin v. Parker, 4 Cir., 1947, 163 F.2d 1011, cert. denied, 333 U.S. 868, 68 S.Ct. 785, 92 L.Ed. 1146, rehearing denied, 334 U.S. 824, 68 S.Ct. 1073, 92 L.Ed. 1753 (holding that the word "upon" in the Act requires a territorial construction). Apart from

Congressional extensions of the Longshoremen Act,[11] there is neither legislation nor case law to indicate with assurance that the Longshoremen's Act applies on the high seas.[12] How far might well be significant in view of the Outer Continental Shelf Lands Act.[13] Cases touching on the subject give us no reliable fix on what are navigable waters of the United States—the Great Lakes are,[14] waters of Puerto Rico[15] and of the Canal Zone[16] are not.

The Outer Continental Shelf Act Lands Act extends the Longshoremen's Act, but only with respect to injuries occurring as the result of operations for "exploring for, developing, removing or transporting natural resources * * * of the subsoil and seabed." 43 U.S.C.A. § 1333(b) and (c). And at the same time the Act carefully preserves the international character of the waters above the seabed.[17]

11. See, e. g., Defense Base Act, 42 U.S.C.A. § 1651 et seq.

12. However, Section 939 of the Act, dealing with administration, uses the term "injury or death occurring on the high seas." What the effect of this language is on the jurisdiction of the Federal courts in this type of case, we do not yet decide, for that decision must properly await a factual determination in this case.

13. Cf. Huson v. Chevron Oil, Co., 5 Cir., 1970, 430 F.2d 27, cert. granted, 1971, 402 U.S. 942, 91 S.Ct. 1608, 29 L.Ed.2d 109; Rodrique v. Aetna Casualty & Surety Co., 1969, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360, 1969 A.M.C. 1082; Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 1961 A.M.C. 1651; Continental Oil Co. v. London S.S. Owners' Mut. Ins. Ass'n, 5 Cir., 1969, 417 F.2d 1030, cert. denied, 1970, 397 U.S. 911, 90 S.Ct. 911, 25 L.Ed.2d 92.

14. See, e. g., New Amsterdam Casualty Co. v. McManigal, 2 Cir., 1937, 87 F.2d 332; Interlake S.S. Co. v. Nielsen, 6 Cir., 1964, 338 F.2d 879, cert. denied, 381 U.S. 934, 85 S.Ct. 1765, 14 L.Ed.2d 699, rehearing denied, 382 U.S. 873, 86 S.Ct. 20, 15 L.Ed.2d 115.

15. See Guerrido v. Alcoa S.S. Co., 1 Cir., 1956, 234 F.2d 349.

16. See Panama Agencies Co. v. Franco, 5 Cir., 1940, 111 F.2d 263. This case may be particularly apposite since it contains an express holding that the reason the Longshoremen's Act did not apply to an injury occurring in the Canal Zone is that the Act applies only to navigable waters of the United States.

17. "(a) It is declared to be the policy of the United States that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter.

   (b) This subchapter shall be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to navigation and fishing therein shall not be affected. Aug. 7, 1953, c. 345, § 3, 67 Stat. 462."
   43 U.S.C.A. § 1332.
   See also Atlantis Development Corp. v. United States, 5 Cir., 1967, 379 F.2d 818. And this Congressional policy has been carried into recognition by international treaties. See, e. g., Treaties and Other International Acts Series No. 5578 (1964), adopted at Geneva, April 29, 1958, signed on behalf of the United States, September 15, 1958, approved by the Senate on May 26, 1960 (106 Cong.Rec.

The upshot is that the Trial Court once again moved too far too fast.[18] There was a maritime claim for which, if proved, recovery could be had *unless* —and the unless is the Longshoremen's Act. That "unless" turns on a virtually uncharted factual-legal question. When the facts—not just what the lawyers say are the facts—are established, the Court can then safely, albeit only initially, act. But this case must go back for Shipbuilder to demonstrate *factually*—not merely by allegation—that Williams' claim is barred.

Affirmed in part; reversed in part; remanded with instructions.

11182–83), ratified by the President on March 24, 1961 (44 State Dep't Bull. 609) and entered into force June 10, 1964 (50 State Dep't Bull. 946).

18. Cf. Barber v. Motor Vessel "Blue Cat," *supra*.