**John HAAS and Catherine Haas, h/w**

v.

**653 LEASING COMPANY.**

**John HAAS and Catherine Haas, h/w**

v.

**SUN SHIPBUILDING & DRYDOCK COMPANY.**

Civ. A. Nos. 73–2026, 73–2078.

United States District Court,
E. D. Pennsylvania.

Jan. 25, 1977.

Morris M. Shuster, Philadelphia, Pa., for plaintiffs.

Victor L. Drexel, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case concerns the right of the employee of a shipbuilding company, seriously injured while working to complete a ship which had undergone sea trials but was not yet commissioned, to assert a personal injury claim under the maritime law against his employer or against his employer's wholly owned subsidiary which held title to the hull, as against the claim that the employee's exclusive remedy is compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq ("LHWCA") (the so-called "comp bar").

On September 20, 1971, plaintiff John Haas, a citizen of Pennsylvania and an employee of defendant Sun Shipbuilding and Drydock Company, a Pennsylvania corporation ("Sun Ship") was working as a pipefitter on Hull 653 which, at the time, was moored in the Delaware River, a navigable waterway, at Chester, Pennsylvania.[1] Hull 653 was being built by Sun Ship but was owned by defendant 653 Leasing Company ("653"), a Delaware corporation formed by Sun Ship as a vehicle for financing construction of the hull which, after christening, was known as the SS "Sohio Resolute." Hull 653 had undergone sea trials, after which it returned to the Sun Ship yard for the completion of unfinished work. On September 20, 1971, in the course of that work, plaintiff slipped and fell down a ladder leading to the engine room of Hull 653, injuring his back. He received compensation from Sun Ship under the LHWCA. Two separate actions are before us (one against each defendant). Jurisdic-

1. Plaintiff's wife Catherine Haas has joined as a party plaintiff to assert a claim for loss of consortium. However, because this opinion addressed only matters of liability, we shall refer hereinafter only to "plaintiff."

tion is founded upon 28 U.S.C. § 1333 (our admiralty jurisdiction).[2] This opinion addresses the motion of the defendants for summary judgment.

In terms of legal theory, plaintiff asserts a breach of defendants' warranty of seaworthiness as well as of their (federal) maritime law duty to provide plaintiff with a safe place to work.[3] Sun Ship bases its motion for summary judgment primarily on the ground that plaintiff's exclusive remedy against his employer for work-related injuries is the compensation provided for by the LHWCA, which plaintiff has already received.[4] Moreover, Sun Ship and 653 claim that they are entitled to summary judgment on plaintiff's unseaworthiness claim because Hull 653 was not a vessel in navigation as to which a warranty of seaworthiness existed at the time of plaintiff's accident. 653 also asserts that a negligence claim cannot be made against it because it was not in control of Hull 653 at the time of the accident.

Plaintiff has been unable to mount a serious contest to defendants' arguments regarding the warranty of seaworthiness. However, with regards to defendants' contentions about plaintiff's maritime negligence claim, plaintiff has mounted two highly sophisticated challenges. The first is that his employer Sun Ship is liable to him notwithstanding the LHWCA compensation bar because of its role as an owner *pro hac vice* of the virtually completed hull which, though not a vessel in commerce, was nonetheless in navigable waters, hence subject to maritime jurisdiction. This argument proceeds from an analysis of the Supreme Court case of *Reed v. The Yaka,* 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) and

confronts the outer limits of what Judge Gibbons has described as the "Sieracki-Ryan end-run." [5] As will be seen, we must reject the owner *pro hac vice* argument because of its inapplicability (at least prior to the 1972 amendments to the LHWCA) to negligence as opposed to unseaworthiness claims, and grant Sun Ship's motion.

Plaintiff's second approach, almost as highly conceptual, relates to his claim against 653. Plaintiff submits that because the Sun Ship employee in control of the construction of the hull was also an officer of 653, there is a genuine issue of material fact as to whether 653 controlled the hull at the time of plaintiff's accident, and alternatively, that 653 is a joint venturer with Sun Ship in the building of the hull and, as such, is vicariously liable for any negligence of Sun Ship which caused plaintiff's injuries. In such event plaintiff asserts the right to sue 653 as a third party under 33 U.S.C. § 933(a). Needless to say, 653 also counters the plaintiff's contentions, maintaining that the plaintiff's control argument is skewed and misconceived, and that the joint venture argument does not defeat the "comp bar." We find no dispute as to the material facts which have been developed from an extensive discovery record, and, for reasons which will at length appear, we will also grant 653's motions.

As our recital of the arguments and counterarguments of the parties suggests, the legal contention of the parties on the present motion cannot be understood without a recitation of the history of Hull 653 and an understanding of the corporate and financial relationship of the defendants. The following description is based on undisputed facts culled from the record.

---

2. The defendants have not disputed the existence of admiralty jurisdiction, 28 U.S.C. § 1333, nor could they. The hull was in navigable waters at the time of the accident, and the mere fact that it was not yet a vessel (see discussion, *infra*) is irrelevant to the exercise of admiralty jurisdiction for a maritime negligence claim. *See Williams v. Avondale Shipyards,* 452 F.2d 955 (5th Cir. 1971); *Dagger v. U.S.N.S. Sands,* 287 F.Supp. 939 (S.D.W.Va. 1968); *Rogers v. M/V Ralph Bollinger,* 279 F.Supp. 92 (E.D.La.1968), all involving acci-

dents on ships under construction. We also have diversity jurisdiction against defendant 653.

3. Plaintiff has not asserted a state law negligence claim.

4. This cause of action arose prior to the 1972 amendments to the LHWCA.

5. *Griffith v. Wheeling Steel,* 521 F.2d 31, 42 (3d Cir. 1975).

## II. The Undisputed Facts Relevant to Defendants' Motions

Pursuant to a charter agreement reached in the late 1960's between Sun Ship and Mathiasen's Tanker Industries, Inc. (Mathiasen's), Sun Ship commenced to build a group of three oil tankers. Construction of the third tanker in the group, Hull 653, began in 1970. To facilitate federally insured financing of the construction of Hull 653, Sun Ship organized 653 to own the ship. Sun Ship holds all of 653's outstanding stock, and all of 653's officers and directors are also Sun Ship officers. 653's officers and directors are not compensated for their services, aside from the salary they receive from Sun Ship. The officers and directors of 653 do not have offices other than their Sun Ship offices, and 653's board of directors meetings are held in Sun Ship's Engineering Management Building in Eddystone, Pennsylvania.

On June 15, 1971, Sun Ship and 653 entered into a construction agreement which required 653 to pay Sun Ship $20,600,000.00 for the completed vessel, an amount which 653 would raise by issuing federally guaranteed bonds, with Philadelphia National Bank as trustee. Under the contract, title to the hull, to the extent completed, was vested in 653. It is undisputed that 653 was the actual owner of the hull at the time of plaintiff's accident. 653, shortly after contracting with Sun Ship, entered into a bareboat charter agreement with Mathiasen's in which Mathiasen's agreed to charter the completed vessel for a term of 18 years, in exchange for monthly payments equal to 653's monthly bond payments.

Hull 653 was launched on August 21, 1971 and underwent sea trials on September 16 and 17, 1971. Plaintiff was not aboard Hull 653 during the sea trials, and Hull 653 was not commissioned at the time of the sea trials. It was allowed to go to sea for limited purposes under a master carpenter's certificate. After the sea trials were completed, Hull 653 returned to the Sun Ship dock for further work (it was moored in the Delaware River), and it was in the course of performing this work (on September 20, 1971) that plaintiff was seriously injured. A work force of Sun Ship employees performed this construction as it had all other work on Hull 653. Robert Galloway, vice president of operations of Sun Ship and a vice president and director of 653, supervised the construction work.

On September 30, 1971, ten days after plaintiff's accident, and after it was certified, Hull 653 was formally delivered to its owner, 653. The ship was accepted on behalf of 653 at Sun Ship's offices by George Liacouras, treasurer of Sun Ship and Treasurer and Assistant Secretary of 653. On the same day, 653 transferred the watch of Hull 653 to the licensed officers of Mathiasen's. Documents entitling the vessel to sail were posted, and keys to the stateroom were given to the ship's officers. The ship remained in the Sun Ship yard until November 5, 1971, when it began trading.

The foregoing undisputed facts form the basis for the discussion which follows and the granting of summary judgment for defendants. There are no material facts as to which there is a genuine issue, hence the questions before us are purely legal ones.

## III. Discussion

### A. Plaintiff's Unseaworthiness Claim

The doctrine of seaworthiness is not applicable to a maritime personal injury case unless (1) the obligation to provide a seaworthy vessel is owed to the plaintiff; and (2) the vessel is in navigation. See 2 M. Norris, The Law of Maritime Personal Injuries § 321 (3d ed. 1975). Although we have serious doubts as to whether a pipefitter working on the construction of a vessel is a person to whom the duty to provide a seaworthy vessel is owed, the parties have not addressed, and we need not reach that issue. For, we do agree with defendants that a launched but uncommissioned vessel which has returned to the yard for further work after sea trials is not a vessel in navigation. The case law on this point is rather clear.

In *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955 (5th Cir. 1971), the court

defined the analogous "in navigation" requirement of the Jones Act[6] as follows:

> The term 'in navigation' means 'engaged as an instrument of commerce and transportation on navigable waters.'

*Id.* at 958. Here the parties agree that the ship did not engage in commerce and transportation until after it left the Sun Ship yard over a month after the accident. It in fact could not have legally done so prior to receiving its Coast Guard certificate of inspection on September 30, 1971, ten days after the accident. Merely because the ship was launched and sailing upon navigable waters during sea trials does not mean that it was "in navigation," a term of art. The purpose of sea trials is to test the ship, not to engage in commerce or transportation.[7] In *Williams,* the plaintiff, who was employed by the ship builder, was injured during the ship's final sea trials. The court stated:

> [N]o warranty of seaworthiness was owed to anyone. The whole purpose of the sea trial was to ascertain what additional work would be required to make the [ship] fully fit. . . . At this stage of construction no one was holding forth to any persons going aboard the vessel that she was in fact completed, fit and seaworthy.

452 F.2d 955 (5th Cir. 1971). *See also West v. United States,* 361 U.S. 118, 122, 80 S.Ct. 189, 192, 4 L.Ed.2d 161, 165 (1959); *Frankel v. Bethlehem-Fairfield Shipyard,* 132 F.2d 634 (4th Cir. 1942). Although here the accident occurred three days after sea trials, the *Williams* principle still applies.

■ Plaintiff asserts that the test is not whether the vessel is engaged as an instrument of commerce and transportation but rather whether it is completed and deliv-

ered at the time of the accident. Second, he claims that *when* Hull 653 was to be completed and delivered in this case was not the subject of arms length negotiations, since the builder and the owner are so closely related, leaving it for the court to determine whether the ship could have been completed and delivered prior to plaintiff's accident. We find the former argument to be contrary to precedent and the latter argument without precedent and unpersuasive. We hold that the proper test is whether the vessel is engaged as an instrument of commerce or transportation, not whether it is completed or delivered.

The cases which plaintiff cites in support of his position are not contrary to the above view.[8] The cases, *Rogers v. M/V Ralph Bollinger,* 279 F.Supp. 92 (E.D.La.1968); *Frankel, supra; Williams, supra;* and *Alfred v. M/V Margaret Lykes,* 398 F.2d 684 (5th Cir. 1968), merely state at most that the warranty of seaworthiness does not arise if the ship is uncompleted, not that completion triggers the existence of the warranty. From these cases we may only conclude that an uncompleted vessel is not in navigation, not that a completed vessel is automatically in navigation. Since the parties agree that Hull 653 was not engaged as an instrument of commerce and transportation at the time of the accident, clearly no warranty of seaworthiness existed, and summary judgment for the defendants must be granted on the unseaworthiness claim.

**B. Plaintiff's Maritime Negligence Claim**

**1. The Claim Against Sun Ship (The Owner Pro Hac Vice Argument)**

■ Section 905 of the LHWCA, which creates the "comp bar" to actions by an

---

6. See *Roper v. United States,* 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961).

7. A vessel of this size and potential as a cargo carrier cannot take to sea and ply its trade without governmental sanction. *See generally* 46 U.S.C. § 1–63. Moreover, the activities in which a new vessel may engage on a master carpenter's certificate (as this hull was) are carefully circumscribed. See 46 U.S.C. § 24.

8. In fact, plaintiff quotes the court in *Rogers v. M/V Ralph Bollinger,* 279 F.Supp. 92 (E.D.La. 1968), a case which he relies on in the unseaworthiness section of his brief, as stating, "[T]he warranty of seaworthiness is imposed only upon vessels in navigation. . . . [The term 'in navigation'] requires only that the vessel be 'engaged as an instrument of commerce and transportation on navigable waters.' " *Id.* at 94–95.

employee against his employer, provides as follows: [8a]

> The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury was due to the contributory negligence of the employee.

Plaintiff contends that his action is not barred by § 905 despite its literal application, because of the doctrine of *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). In that case, Reed, a longshoreman, was injured while loading the steamship Yaka. He filed a libel *in rem* against the ship. The Yaka's owner, Waterman Steamship Corporation, appeared as claimant of the ship and impleaded Pan-Atlantic Steamship Corp., Reed's employer and the bareboat charterer of the Yaka. The district court, finding that the Yaka was unseaworthy because of a defective pallet which caused the injury, held against Waterman. Because the pallet was supplied by Pan-Atlantic, the court held that it must make Waterman whole.

The Third Circuit reversed as to both defendants, finding that Waterman was not liable because the ship had been demised under bareboat charter and that Pan-Atlantic could not be held liable because compensation was Reed's exclusive remedy against his employer. However, the Supreme Court reversed the Third Circuit on the basis that Pan-Atlantic, as bareboat charterer, was an owner *pro hac vice* [9] and as such was personally liable for the unseaworthiness of the vessel. It then reviewed the cases which extended the warranty of seaworthiness to longshoremen, see *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and which required the independent stevedore to make whole the shipowner if the shipowner were required to pay an employee of the stevedoring company for a breach of the warranty of seaworthiness, see *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The effect of *Sieracki* and *Ryan* was to place the burden of the longshoreman's recovery on his employer despite the exclusive remedy provision of the Act. The Third Circuit's decision had denied this recovery to the employee because his employer happened to also be the owner *pro hac vice* of the ship, whereas the employee could have recovered if the ship had been independently owned. The Court, in concluding that Pan-Atlantic could be held liable to Reed for the unseaworthiness of the vessel, stated:

> [O]nly blind adherence to the superficial meaning of a statute could prompt us to ignore the fact that Pan-Atlantic was not only an employer of longshoremen but was also a bareboat charterer and operator of a ship, and, as such, was charged with the traditional, absolute, and nondelegable obligation of seaworthiness which it should not be permitted to avoid.

373 U.S. at 415, 83 S.Ct. at 1353.

Plaintiff argues that *Reed* stands for the proposition that an entity which is both the employer of the injured plaintiff and the owner *pro hac vice* of the vessel on which

---

**8a.**  33 U.S.C. § 905, the comp bar provision in effect when this cause of action arose, was reenacted without change in the 1972 LHWCA amendments as § 905(a).

**9.**  *Black's Law Dictionary* defines *"pro hac vice"* as meaning "for this one particular occasion."

he is injured is not insulated from a tort suit because of its employer status. Sun Ship, he contends, is not only his employer, but also the owner *pro hac vice* of the ship because either (1) it controlled 653, the owner of record, or (2) Sun Ship and 653 were joint venturers. Sun Ship contests plaintiff's characterization of its relationship with 653 and also argues that the basis of the *Reed* decision is founded on the "traditional, absolute and nondelegable obligation of seaworthiness," and thus it cannot be read to allow a maritime negligence claim (as opposed to an unseaworthiness claim) against the employer in the face of the comp bar. We have disposed of plaintiff's unseaworthiness claim. And, for the reasons which follow, we agree with Sun Ship that *Reed* does not apply to plaintiff's negligence claim, and thus we need not reach the complex issues raised by plaintiff's contentions regarding the relationship of Sun Ship and 653.

A careful analysis of the Court's opinion in *Reed* reveals that the Court had two primary concerns which led to its decision. First, the Court recognized the inequity of allowing an employee to recover from his employer via the *Sieracki-Ryan* route if the ship is independently owned, while not allowing recovery if the ship is owned or chartered by the employer. Second, the Court expressed its reluctance to allow the shipowner or charterer to avoid the traditional obligation of providing a seaworthy vessel.

We do not find the second consideration to be influential in a negligence action where the absolute, nondelegable obligation of seaworthiness is not in issue. This distinction between an unseaworthiness claim and a negligence claim in the context of the owner *pro hac vice* argument was recognized by the Ninth Circuit in *Arvidson v. Dillingham Corp.*, 462 F.2d 1 (9th Cir.), *cert. denied*, 409 U.S. 983, 93 S.Ct. 321, 34 L.Ed.2d 247 (1972). In that case, the plain-

tiffs, who were painters employed by the defendant, were injured when an explosion occurred on a barge being constructed by the defendant for its own use. The plaintiffs received workmen's compensation, but then brought a federal court action alleging unseaworthiness of the vessel and negligence of the defendant in failing to provide a safe place to work. Plaintiffs later conceded that their unseaworthiness claim could not succeed because the vessel was not in navigation. Defendant moved for summary judgment on the negligence claim on the ground that compensation was the plaintiffs' exclusive remedy. Both the district court and Court of Appeals agreed, rejecting plaintiffs' contention that *Reed* applied to negligence claims.

In dismissing plaintiffs' negligence claim, the Ninth Circuit noted that in both *Reed* and *Jackson v. Lykes Bros. Steamship Co.*, 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967),[9a] the Supreme Court had only discussed unseaworthiness claims. It then pointed to several cases in which the Supreme Court had discussed at length the distinctions between an unseaworthiness claim and negligence claim, see *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498–99, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); *Mitchell v. Trawler Racer*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941, 948 (1960), and concluded that there is "nothing in any of the decisions of the Supreme Court to suggest that this additional right of recovery [right given by *Reed*] would be extended to an action for negligence." 462 F.2d at 4.[10] We agree.

Turning to plaintiff's other *Reed*-based argument, the Court in *Reed* was influenced, as we have noted by equitable considerations, *i. e.*, the inequity of denying recovery to plaintiff Reed because the owner *pro hac vice* was his employer, whereas he could have recovered had the (*pro hac vice*) owner or bareboat charterer been a

---

**9a.** See p. 1312 *infra* for a discussion of *Jackson*.

**10.** The Ninth Circuit in *Arvidson* cites a number of other cases arising out of different factual situations in which the courts rejected the

notion that *Reed* extends to negligence claims. See *Arvidson v. Dillingham Corp.*, 462 F.2d 1, 3 n. 7 (9th Cir.), *cert. denied*, 409 U.S. 983, 93 S.Ct. 321, 34 L.Ed.2d 247 (1972).

third person. These "equitable" considerations do not apply here, in the negligence context. As will be seen *infra,* the sole basis for plaintiff's contention that 653 could be liable in negligence to him is 653's putative control by virtue of the financial relationship between 653 and Sun Ship. However, if 653 were completely independent of Sun Ship, plaintiff could not have asserted a negligence claim against it because it would not have been in control of the vessel at the time of the accident. *West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). Thus, assuming independence of the shipowner, the employee of a shipbuilder could not successfully sue the owner of the ship for negligence in failing to provide a safe place to work under the facts at bar. By applying the exclusive remedy provision to plaintiff's negligence claim in this case, we therefore do *not* deny him a remedy that he would have had if the shipowner were independent. The *Reed* analogy is thus undone.

Plaintiff contends that the Supreme Court in *Jackson v. Lykes Bros. Steamship Co., supra,* and the Third Circuit in *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975), approved the application of the *Reed* doctrine to negligence claims. Since plaintiff's contention regarding *Jackson* is more easily disposed of, we shall deal with it first.

In *Jackson,* plaintiff, the widow of a longshoreman employed by a steamship company, who died after inhaling noxious fumes while working on one of the defendant's vessels, filed an action in state court alleging that her husband's death was caused by defendant's negligence or the unseaworthiness of the vessel. The Court of Appeal of Louisiana, the highest state court that heard the case, decided that the action was barred by the exclusive remedy provision of the LHWCA, interpreting *Reed* as allowing an *in rem* action against the ship but not an *in personam* action against the shipowner. The question was presented to the Supreme Court phrased as follows by the plaintiff-petitioner:

Can there be *in rem* liability of a vessel to a seaman/longshoreman when there is no *in personam* liability of the shipowner/operator of the vessel, *for the breach of the warranty of seaworthiness?"* (emphasis added). Brief for the petitioner at 3. The Supreme Court reversed and reaffirmed *Reed.* The Court's opinion, after noting that plaintiff's state court complaint contained a negligence claim, spoke solely of the warranty of seaworthiness. For instance, the Court stated: "In the final analysis the contention here against recovery as in [*Reed*] is that the longshoreman who is employed to work on a ship by an independent stevedore company instead of the shipowner can recover for the unseaworthiness of the vessel, but a longshoreman hired by the same shipowner to do exactly the same kind of work on an unseaworthy ship cannot recover. We reject this contention as we did before." 386 U.S. at 735, 87 S.Ct. at 1422.

The present plaintiff argues that by acknowledging that Mrs. Jackson had alleged negligence in her complaint, the Supreme Court, by reversing and remanding, impliedly approved the application of *Reed* to negligence claims. The question posed by the petitioner in *Jackson* was expressed, however, in terms of the warranty of seaworthiness, just as the Court's discussion of *Reed* was limited to the nature of the warranty of seaworthiness. The Court's discussion of the bases of *Reed* in fact reinforces our earlier expressed view as to: (1) the rationale of the Court in *Reed*; and (2) why the *Reed* doctrine should be limited to warranty of seaworthiness claims.

In *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975), the Third Circuit held that an employee who received LHWCA compensation could assert a negligence claim against his employer who was the owner *pro hac vice* of the barge on which he was injured despite the exclusive remedy provision in § 905(b) of the 1972 LHWCA Amendments (the accident occurred after the effective date of the 1972 amendments). In the course of its analysis, the court discussed *Reed* in a manner which

suggests that it read that case to cover both unseaworthiness and negligence cases. Plaintiff argues that we are bound by this apparent interpretation of *Reed*. After a careful analysis of the reasoning of the *Griffith* court, we believe that the court did not construe *Reed* in the broad manner suggested by plaintiff. To understand why, we must discuss in detail the legal issues involved in *Griffith* and the statutory context in which they arose.

Griffith, an employee of Wheeling Steel, was injured in May 1973, while working on a barge which had been chartered by Wheeling. Griffith filed an action against Wheeling as owner *pro hac vice* and against the actual barge owner, alleging negligence and unseaworthiness of the vessel. The amendment upon which the court focused in *Griffith* was 33 U.S.C. § 905. As we have noted, the amended section repeats in § 905(a) the exclusive remedy provision of the old act (see n. 8a *supra*) and then adds § 905(b)[11] which reads in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title . . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness . . . .

It is this provision, coupled with the definitional sections of the 1972 amendments,[12] which creates constructional problems. For, if the vessel's owner or owner *pro hac vice* is the employer of the injured party, then § 905(b) seems to allow a § 933 action by the employee against his employer in direct conflict with § 905(a), the exclusive remedy provision. Finding Wheeling to be an owner *pro hac vice*, the *Griffith* court was faced with resolving this conflict.

In his opinion for the *Griffith* court, Judge Gibbons set forth at length the conceptual reasons why the plaintiff should have no recovery against his employer, with particular emphasis on § 905(a). He followed with an analysis of the policy reasons for that result:

> It would place longshoremen in the same position with respect to seaward third parties as to shoreside third parties. If a truck owned and operated by an outside contractor should injure the longshoreman on the pier he would have a third party action, while if the truck was owned and operated by his employer, he would not. The heart of all workmen's compensation systems is the trade-off between the certainty of benefits and the limitation of employer liability. There is no argument in logic and reason why an employer who owns barges should be treated less favorably than an employer who owns trucks.

521 F.2d 31 at 42. However, he continued:

> But while logic and common sense suggest the literal application of § 905(a), the ghost of *Sieracki-Ryan* stands in the way. The Supreme Court has already construed the exclusive remedy provision as permitting a suit against a *pro hac vice* who was also an employer. In *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), a longshoreman was injured as a result of an unseaworthy condition on board the vessel The Yaka, which was under bareboat charter to Pan-Atlantic Steamship Corporation, his employer. Reed brought an in rem action against the vessel. He was not a member of the crew, and thus was covered under LHWCA. Reviewing the way in which *Sieracki* and *Ryan* had already made an end-run around the exclusive remedy provision in § 905(a) (then § 905), Justice Black, writing for the Court, concluded:

**11.** Section 905(b) is intended, among other things, to overrule the *Sieracki-Ryan* liability of the employer of a longshoreman. *Lucas v. "Brinknes" Schiffahrts Ges. Franz Lange G.m. B.H. & Co., K.G.*, 387 F.Supp. 440 (E.D.Pa. 1974).

**12.** The definitional sections, 33 U.S.C. § 902(21) define "vessel" as including the vessel's owner *pro hac vice*.

In the light of this whole body of law, statutory and decisional, only blind adherence to the superficial meaning of a statute could prompt us to ignore the fact that Pan-Atlantic was not only an employer of longshoremen but was also a bareboat charterer and operator of a ship and, as such, was charged with the traditional absolute and nondelegable obligation of seaworthiness which it should not be permitted to avoid. . .

373 U.S. at 415, 83 S.Ct. at 1353. Thus § 905, now § 905(a), was held to be no bar to a suit against a vessel chartered to a *pro hac vice* owner which was also an employer liable for compensation payments. . . .

. . . . .

Since Congress made no change in the operative language of the exclusive remedy provision, we would appear to be bound by the eviscerating construction of *Reed v. The Yaka, supra.* Congress was aware of that construction, and deliberately chose to deal with it only to the limited extent of the second sentence in § 905(b). *The vessel, even a vessel which is an employer under the Act, is relieved of liability for negligence of persons engaged in providing stevedoring services, but is not relieved of liability for its own "owner" occasioned negligence.*

521 F.2d 31 at 42–43 (footnotes omitted, emphasis added). Judge Gibbons concluded that no construction appeared open which could shield Wheeling from liability as a *pro hac vice* owner for the negligence of employees engaged in services in connection with the barge other than stevedoring.[13]

We do not read *Griffith* as interpreting *Reed* to authorize a negligence action by an employee against his employer who happens also to be the owner *pro hac vice* of the ship on which he was injured under the state of the law *before* the 1972 LHWCA amendment. Instead, we read it for what it teaches: that where Congress was aware of

the "eviscerating construction" of *Reed*, and included owners *pro hac vice* (via the definitional sections, see n. 12 *supra*) within the ambit of those suable by the injured person pursuant to § 933 for "owner" occasioned negligence in the amended statute, but failed to change the operative language of the § 905 comp bar provision, it was necessary to hold Wheeling, as owner *pro hac vice,* liable so as to give meaning and effect to the express Congressional authorization of a negligence action against the owner (*pro hac vice*) employer in (the new) § 905(b).

We conclude then that the *Griffith* court did not interpret *Reed* as allowing a negligence action in the situation at bar. Furthermore, for the reasons discussed above, we interpret *Reed* as being limited to unseaworthiness claims, and it therefore cannot support plaintiff's negligence claim against Sun Ship. Summary judgment must therefore be granted in favor of Sun Ship on plaintiff's negligence claim.

2. *The Claim Against 653 (The Control and Joint Venturer Arguments and the Comp Bar)*

In *West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), the plaintiff, an employee of an independent contractor engaged to reactivate a vessel, was injured aboard the vessel, which was owned by the United States. Prior to West's accident the ship had been towed to the contractor's repair dock for the purpose of performing the work contracted for. Although the United States had a team of inspectors on board the ship, the team had no control over it. While the vessel was at the contractor's dock, the contractor had complete responsibility for the making of the repairs and control over the vessel. West contended that the duty to provide a safe place to work, the basis of his maritime negligence claim, was a nondelegable duty, but the Court held otherwise. It found that where the owner:

**13.** However, the matter was remanded to the District Court for resolution of various factual matters which the District Court had not theretofore addressed because of its grant of summary judgment.

# 1315

had no control over the vessel, or power either to supervise or control the repair work . . . . . [i]t appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs. . . .

361 U.S. at 123, 80 S.Ct. at 193.

653 contends that, (1) it similarly had no responsibility for the construction of Hull 653 and exercised no control over it while it was being constructed; and (2) in view of *West*, it owed no duty to the plaintiff to provide him with a safe place to work. Plaintiff does not disagree with 653's explication of *West*, but counters that, (1) there is a genuine issue of material fact as to whether 653 controlled Hull 653 at the time of the accident because the Sun Ship employee in control of the construction of the ship was also an officer of 653; and (2) 653 was a joint venturer with Sun Ship in the building of Hull 653, and as such, is vicariously liable for any negligence of Sun Ship which proximately caused plaintiff's injuries. We shall consider plaintiff's arguments seriatim.

■ Plaintiff contends that a fact question is presented as to the existence of control over Hull 653 by the officers and directors of 653, who were also officers of Sun Ship. Plaintiff points out in particular that Robert Galloway, a Sun Ship vice president of operations, was in charge of construction of Hull 653, and was also a vice president and director of 653. Plaintiff, however, has not provided any evidence that, during the construction of Hull 653, Galloway or any other Sun Ship employee was acting other than in his capacity as a Sun Ship employee.

Mr. Galloway testified at his deposition as follows:

I viewed my position at the time as being one of constructing a ship as an employee of [Sun Ship]. My relationship with [653] was a side type of thing.

I viewed my duties as being to represent [Sun Ship] in the construction of the vessel. The fact that I was an officer of [653] was secondary in nature to it. Galloway deposition at 25.

Plaintiff notes that Galloway admitted that he felt he was "carrying out the purposes" of 653 by performing his duties for Sun Ship. We think this, however, does not, even in microcosm, show that he was controlling the construction of Hull 653 on behalf of 653.

Our own research of the record reveals nothing which supports plaintiff's contention that 653 exercised control over the construction of Hull 653. The mere fact that Galloway or anyone else was an officer of both corporations does not aid plaintiff. It is quite common for persons engaged in business to serve as officers or directors of more than one corporation as well as to occupy positions as officers or directors of civic organizations and religious or other nonprofit institutions. It could hardly be argued that such interlocking directorates or officerships lead to responsibility on the part of one of the organizations for liability arising out of the activities of the other.

It is also of importance to note that the construction of Hull 653 took place in Sun Ship's yard in accordance with a construction contract entered into by Sun Ship and 653 which stated that Sun Ship "shall design, construct and deliver the vessel" to 653. Finally, because it held all of 653's stock, it could be said that Sun Ship controlled the actions of 653, but the opposite could not be the case. In the sphere of human relationships, children often directly or indirectly control the actions of their parents. The same is not true in corporate families.

■ Plaintiff's second argument, as we stated above, is that 653 is a joint venturer of Sun Ship, vicariously liable for the torts of its co-venturer committed in the course of conducting the activities of the venture. 653 concedes the general proposition that the maritime law recognizes joint ventures and the liability of joint venturers, *see Clinchfield Fuel Co. v. Henderson Iron Works*, 254 F. 411 (5th Cir. 1918), and *Rowe v. Brooks*, 329 F.2d 35 (4th Cir. 1964), but

these cases do not involve claims by employees against a joint venturer in attempted circumvention of the comp bar. 653 submits that, even assuming *arguendo* that it entered into a joint venture with Sun Ship and would be vicariously liable for Sun Ship's torts, it may nonetheless assert the exclusive remedy provision of the LHWCA because its co-venturer had paid compensation to plaintiff, and thus plaintiff cannot assert a negligence claim against it.

Plaintiff argues that 653 is a third party against whom the Act in § 933(b) states that the employee has an action despite the exclusive remedy provision. This follows, plaintiff says, because the employee gives up only his action against his employer in exchange for the guaranteed compensation, not an action against a third party which is vicariously liable. Plaintiff has been unable, however, to find any case allowing a negligence action against one member of a joint venture where the injured worker had already received compensation under LHWCA or under the applicable state workmen's compensation law. He cites instead cases involving employees of subcontractors who sued the general contractor, alleging negligence of the general contractor. *See Probst v. Southern Stevedoring Co.*, 379 F.2d 763 (5th Cir. 1967); *Perry v. Baltimore Contractors*, 202 So.2d 694 (La. App.1967). In both of these cases the courts found that the general contractor was not the worker's employer within the meaning of the applicable compensation law. We find these cases to be inapposite.

The relationship of general contractor to subcontractor is entirely different from that of joint venturers. None of the distinguishing characteristics of a joint venture [14] are present in the general contractor-subcontractor relationship. The general contractor and subcontractor do not, for instance, share the profits of their labors, or have a joint proprietary interest or right of mutual control over the enterprise.[15] A

joint venture, on the other hand, is, in a sense, a separate entity. See *Fallone v. Misericordia Hospital*, 23 A.D.2d 222, 259 N.Y.S.2d 947, 950 (1st Dep't 1965). The joint venture may employ its own workers, pay their social security taxes and withhold taxes from their pay. The participants in the joint venture may be held jointly and severally liable for the debts of the joint venture. For many purposes, a joint venture is treated in the same manner as a partnership.

■ The separate entity, the joint venture, is the de facto employer of the workers carrying out the purposes of the venture, even though technically the workers may be on the payroll of only one of the venturers and that particular venturer may provide the workers' workmen's compensation coverage. We hold that the joint venture and, derivatively, the participants in the venture, are thus the worker's "employer" for purposes of the Act and thus enjoy the protection of the exclusive remedy provision.

By reaching this conclusion, we are placing the employee of a joint venture in no worse position than an employee of any other entity. If the builder and the owner are not joint venturers, an employee of the builder, injured while constructing a ship for an independent owner, could not, under the facts and law applicable to this case, be able to sue the owner of the ship for negligence because of his absence of control. See discussion, *supra*. Plaintiff here seeks to use the joint venture concept to link 653 and Sun Ship and thereby hold 653 liable for Sun Ship's torts, while maintaining that, for purposes of the exclusive remedy provision, they are separate entities. We do not think that plaintiff can have his cake and eat it.

653 cites a number of state cases in support of its position. While these cases are not factually indistinguishable from the

---

**14.** *See McRoberts v. Phelps*, 391 Pa. 591, 599, 138 A.2d 439, 443–44 (1958).

**15.** Another reason why the cases cited by the plaintiff are distinguishable is that in them the employees claimed that the general contractors were negligent, not that they were vicariously liable.

cases at bar, they do lend support to our conclusion. In *Fallone v. Misericordia Hospital*, 23 A.D.2d 222, 259 N.Y.S.2d 947 (1st Dep't 1965), the plaintiff was injured while working on the construction of a hospital which was being built by two construction companies as joint venturers. Plaintiff, who claimed to be an employee of one of the venturers, Vermilya, sued the other one, Industrial, which relied on the exclusive remedy provision as a defense. The court found that the plaintiff was receiving his salary from the joint venture which had also provided a policy of workmen's compensation insurance. The court concluded that the plaintiff was an employee of the joint venture, which was his employer within the meaning of the New York Workmen's Compensation Law,[16] and found Industrial's defense to be a good one:

> The joint venture herein obtained . . [workmen's] compensation insurance. We see no reason in law or public policy why such insurance should not insulate the members of the joint venture from liability for negligence where an employee of the joint venture has been injured.

Although here the insurance was obtained by one member of the assumed joint venture,[17] the same policy considerations nonetheless apply.

Another New York court applied the same principle in *Felder v. Old Falls Sanitation Co., Inc.*, 47 A.D.2d 977, 366 N.Y.S.2d 687 (3d Dep't 1975). In that case, the plaintiff was injured while working on a garbage truck owned by defendant Old Falls. Plaintiff was, however, on the payroll of Town, another company. The lower court dismissed plaintiff's action against Town based on the exclusive remedy provision, but allowed him to proceed against Old

Falls. The Appellate Division then reversed finding that Town and Old Falls were engaged in a joint venture and thus plaintiff's exclusive remedy against Old Falls was workmen's compensation.

These cases serve to reinforce our conclusion that if 653 and Sun Ship are joint venturers, then plaintiff's negligence claim against 653 is barred by the exclusive remedy provision of the LHWCA. Moreover, plaintiff cannot succeed against 653 because Hull 653 was in the exclusive control of Sun Ship at the time of the accident. 653's motion for summary judgment on plaintiff's negligence claim must therefore be granted.

## IV. *Conclusion*

Plaintiff's unseaworthiness claim must fail because Hull 653 was not a vessel in navigation at the time of the accident. Plaintiff's maritime negligence claim must fail because of the comp bar or exclusive remedy provisions of the LHWCA, notwithstanding plaintiff's highly conceptualized arguments relative to the liability of owners *pro hac vice* and of joint venturers.

Accordingly, we enter an appropriate order granting defendants' motions for summary judgment and entering judgments in their favor.

---

**16.** The New York law defines "employer" more precisely than the LHWCA (33 U.S.C. § 902). Section 2(3) of the New York law states that " 'Employer' . . . means a person, partnership, association, corporation, . . ." The New York law does, however, contain a provision similar to 33 U.S.C. § 933(b) allowing actions against third parties by one who has received or is entitled to workmen's compensation. *See* New York Workmen's Compensation Act § 29(1) (McKinney Supp.1975).

**17.** This distinction would seem to be of little importance considering that here there was no express joint venture agreement. Since Sun Ship and 653 did not conceive of themselves as embarking on a joint venture, it is not surprising that they did not take out a separate workmen's compensation policy.