record and will not be upset on appeal. *See* Fed.R.Civ.P. 52(a).[3]

Brite next attacks the plan on the grounds that the twenty-one notes from twenty-one obligors secured by twenty-one lots is not the indubitable equivalent of his first lien on 200 acres as required by 11 U.S.C. § 1129(b)(2)(A)(iii) (1982). Congress adopted the indubitable equivalent requirement of section 1129(b)(2)(A)(iii) from *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935). *In re Hollanger*, 15 B.R. 35, 45 (Bankr.W.D.La.1981). In *Murel*, 75 F.2d at 942, Judge Hand considered whether the substituted security was completely compensatory, and the likelihood that the secured creditor would be paid, in determining whether the plan of reorganization provided the secured creditor with the indubitable equivalent of his original security.

■ At a hearing before the bankruptcy court, Sun Country presented evidence that the present value of the notes was $153,777.06, over $200 more than the debt. Sun Country also presented evidence that the value of the lots securing the notes was $287,500. At the same hearing, Brite presented evidence that the notes could be sold for only thirty to fifty percent of their face value because of the debtors' poor payment histories on the notes. After adopting the evidence presented by Sun Country as part of the facts, the bankruptcy court held that the notes were the indubitable equivalent of the first lien on the 200 acres.

Brite first complains that the notes are inferior to the first lien he had on the 200 acres in that present value of the notes is worth only fifty percent of its lien and barely exceeds the amount of the debt. Brite then complains that the present value calculation is incorrect because it fails to take into account the possibility of the debtors on the notes defaulting, the debtors' histories of failing to keep their pay-

ments current. Brite also argues that the value the bankruptcy court placed on the lots securing the notes was too high. Brite finally complains that in the event of default, he will be forced to bring twenty-one, rather than one, foreclosure actions at a much greater expense.

To the extent that Brite attacks the findings of the bankruptcy court, we reject his complaints, as the findings were supported by the evidence. We further believe that Brite's other concerns do not render the twenty-one notes dubitable equivalent of the original first lien. As reflected by the district court record, since Brite has taken over collection of the notes, the debtors have generally kept their payments on notes current. Furthermore, if debtors do default on their notes, the value of the land securing the notes, as found by the bankruptcy court, appears sufficient to cover the additional expense of foreclosing on twenty-one separate properties.

AFFIRMED.

**Adeline NADLER, Robert B. Nadler and Carole M. Nadler, Plaintiffs-Appellants,**

v.

**AMERICAN MOTORS SALES CORPORATION, Defendant-Appellee.**

No. 84–2242.

United States Court of Appeals, Fifth Circuit.

July 1, 1985.

---

Oramus, Gideon & Trauger, James V. Doramus, Nashville, Tenn., for plaintiffs-appellants.

James C. Slaughter, Houston, Tex., for defendant-appellee.

Before GEE, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This appeal requires us to harmonize two covenants in a long-term lease agreement covering commercial property. The first covenant obligates the lessee to keep the premises "in good order and condition" during the lease term, and the other demands surrender of the property at termination "in the same condition as when received except for reasonable use and natural wear." We must determine whether either covenant binds the lessee to repair or replace equipment that barely functions when the lease expires. Because the answer depends on facts that remain in dispute, we hold only that the provisions may so obligate the lessee. We thus reverse the summary judgment against the lessors and remand the case for further proceedings.

## I.

The parties' relationship started in 1962 and presumably will end with this litigation. On August 3, 1962, appellee American Motors Sales Corporation (AMSC) leased a new building in Houston, Texas, for a twenty-year period ending September 30, 1982. Five days later, appellant Adeline Nadler bought the building, and the previous owner assigned its lease with AMSC to her. AMSC occupied the building until November 27, 1972, when it sublet the property to Hussman Refrigeration, a firm whose business included repair and installation of heating and cooling equipment. On July 14, 1979, Adeline Nadler sold or gave a ten percent interest in the building to her son, appellant Robert B. Nadler, and his wife, appellant Carole M. Nadler. Hussman used the building until the lease and sublease expired, but it promptly entered into a new agreement under which it began to lease directly from the Nadlers.

At the heart of this case lie the heating, ventilation, and air conditioning (HVAC) system that served the building and the two covenants that govern AMSC's obligations with respect to it. When the builders installed the new system in 1962, it embodied the state of the heating, cooling,

and ventilating art. It included four large heat pumps, which both heated and cooled, and a number of small units that supplied cool air to offices in the rear portion of the building. The Nadlers replaced the system in 1982, after the lease with AMSC ended.

The deterioration that the system suffered over the lease term generated the parties' dispute regarding liability for its repair or replacement. The record does not indicate the maintenance and performance record of the system during the first ten years of the lease, but it does suggest that by 1972 significant problems had developed. Hussman took possession of the building in that year, and the system thereafter required repair an average of once a month. Hussman did the work itself, and it fixed or replaced several condensers and other parts. It also installed electric strip heaters in the HVAC system when the heat pumps no longer performed their heating function. Starting in 1981, moreover, the Nadlers serially commissioned four contractors to evaluate the system. Each contractor reported that the system worked poorly and needed replacement. An AMSC employee, however, contradicted their assessments, testifying on deposition that, as of May 1981, the system "was operating satisfactorily" and "was maintaining temperatures adequately".

A single paragraph of the lease agreement specifies the circumstances in which AMSC had to repair or replace the HVAC system. It provides as follows:

REPAIRS (9) Lessee covenants throughout the term of this Lease, at Lessee's sole cost and expense, to take good care of the demised premises, including the building and improvements now or at any time erected thereon, the equipment, fixtures, motors and machinery thereof, and the parking areas, fences and vaults, if any, and to keep the same in good order and condition, and shall promptly, at Lessee's own cost and expense, make all necessary repairs, interior and exterior, structural and non-structural, ordinary as well as extraordinary, foreseen as well as unforeseen. The term "re-

pairs" shall include replacements or renewals when necessary, and such repairs shall be equal in quality and class to the original work. At the termination of this Lease, Lessee shall surrender the premises in the same condition as when received except for reasonable use and natural wear.

After repeatedly but unsuccessfully demanding that AMSC restore the system to good order or replace it, the Nadlers brought this suit on February 1, 1983, alleging that AMSC had breached paragraph 9 of the lease agreement. The complaint asserted that the district court had diversity of citizenship jurisdiction of the case under 28 U.S.C. § 1332 (1982). The Nadlers claimed that AMSC had breached the lease agreement both by failing to keep the HVAC system in good order during the lease term and by surrendering the system at the end of the term in poor condition. They sought damages in the amount they had paid Hussman to replace the system. They also demanded recovery of court costs, prejudgment interest, and attorney fees.

Both sides moved for summary judgment in early 1984. The Nadlers supported their motion with the affidavit of Robert B. Nadler and copies of the contractors' evaluations of the HVAC system. AMSC responded with the same reports; it also submitted excerpts from two depositions.[1] The district court resolved the cross motions in favor of AMSC, holding simply that

"[p]aragraph 9 of the lease in question, particularly under the undisputed facts, cannot be construed in such a fashion as to require [AMSC] to purchase a new HVAC system for [the Nadlers]." The Nadlers appeal.

## II.

Before addressing the merits of this appeal, we must deal with a problem that has grown distressingly familiar to this Court: The failure properly to allege the basis for diversity of citizenship jurisdiction. Because the error recurs frequently and wastefully diverts this Court from its primary mission, we take the opportunity to outline the simple rules that govern pleading diversity jurisdiction.

■ Each party asserting a claim for relief bears the burden of setting out in his pleading "a short and plain statement of the grounds upon which the court's jurisdiction depends". Fed.R.Civ.P. 8(a)(1); see Strain v. Harrelson Rubber Co., 742 F.2d 888, 889 (5th Cir.1984) (per curiam); Illinois Central Railroad v. Pargas, Inc., 706 F.2d 633, 636 & n. 2 (5th Cir.1983) (requiring affirmative and distinct allegation of jurisdictional grounds); Kerney v. Fort Griffin Fandangle Ass'n, 624 F.2d 717, 719 (5th Cir.1980) (holding that pleader must set out basis for jurisdiction "distinctly and affirmatively"). The statute that confers diversity of citizenship jurisdiction on the federal courts plainly indicates the

---

1. AMSC's submission included a letter in which the Nadlers proposed settlement of the controversy, but the district court struck it from the record. Neither side challenges the court's action.

AMSC does argue, however, that the Nadlers' failure to place certain depositions on file with the district court before it rendered summary judgment prevents consideration of the depositions as part of the record on appeal. See Fed.R.Civ.P. 56(c) (authorizing summary judgment based on "the pleadings, depositions, answers to interrogatories, and admissions *on file*") (emphasis supplied); John v. State of Louisiana, 757 F.2d 698, 710 (5th Cir.1985) ("[T]he nonmovant cannot attack summary judgment ... by introducing new materials into the record on appeal...."). The Nadlers counter that their filing the depositions with their later

"Motion to Alter and Vacate" the summary judgment against them makes the depositions a proper part of the appellate record. We need not resolve the dispute because the record otherwise raises a genuine issue of material fact. The contractors' reports that the Nadlers attached to their summary judgment motion indicate that the HVAC system required replacement at the end of the lease term. The deposition of Paul A. Brunet, an AMSC employee, controverts that assessment of the system; Brunet asserted that the system functioned adequately as late as May 1981. The depositions that AMSC challenges merely provide further support to the Nadler's contention that the system needed repair or replacement. Their inclusion or exclusion from the record thus does not affect our disposition of the appeal.

facts that a pleader must allege to satisfy Rule 8(a)(1). *See* 28 U.S.C. § 1332 (1982). Section 1332 provides for jurisdiction over civil actions between, *inter alia,* "*citizens of different States*". *Id.* § 1332(a)(1) (emphasis supplied). An allegation that the parties are "residents" of particular states does not satisfy the requirements of Rule 8(a)(1); section 1332(a)(1) demands diverse citizenship, not diverse residency. *See, e.g., Bingham v. Cabbot,* 3 U.S. (Dall.) 382, 1 L.Ed. 646 (1798); *Neeley v. Bankers Trust Co. of Texas,* 757 F.2d 621, 634 n. 18 (5th Cir.1985); *Strain,* 742 F.2d at 889; *Kerney,* 624 F.2d at 719; *Delome v. Union Barge Line,* 444 F.2d 225, 233 (5th Cir.), *cert. denied,* 404 U.S. 995, 92 S.Ct. 534, 30 L.Ed.2d 547 (1971).

■ Section 1332 also sets out the allegations necessary to invoke diversity jurisdiction in a case involving a corporate party. Under section 1332(c), "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business". Thus, "allegations regarding the citizenship of a corporation must set out the principal place of business as well as the state of its incorporation...." *Neeley,* 757 F.2d at 634 n. 18; *see Illinois Central,* 706 F.2d at 637; *Joiner v. Diamond M Drilling Co.,* 677 F.2d 1035, 1039 (5th Cir.1982). These rules are straightforward, and the law demands strict adherence to them.

■ The original complaint in this case defectively alleged grounds for diversity jurisdiction. The pleading asserted merely that Adeline Nadler "is a resident of the State of Illinois", that Robert B. Nadler and Carole M. Nadler "are residents of the State of Tennessee", and that AMSC "is a Delaware corporation doing business within the State of Texas". Only the allegation regarding AMSC's state of incorporation tracked the requirements of section 1332. The complaint did not allege the citizenship of the Nadlers or the state of AMSC's principal place of business. It thus failed properly to invoke the jurisdiction of the federal courts.

■ We nonetheless have discretion to permit the Nadlers to cure the defect by amending their complaint in this Court. *See* 28 U.S.C. § 1653 (1982) ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.") Although we construe section 1653 liberally, *e.g., Carlton v. BAWW, Inc.,* 751 F.2d 781, 789 (5th Cir.1985), it authorizes correction only of formal mistakes. Because "we do not sit to receive new evidence", *Strain,* 742 F.2d at 889 n. 2, moreover, the normal course consists in remanding the case rather than in allowing amendment here, *see id.* at 889 & n. 2 (remanding "for determination of whether jurisdictional grounds exist"); *Pargas,* 706 F.2d at 638; *cf. Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553, 555 (5th Cir.1985) (remanding because "we entertain serious doubts that the trial court had subject matter jurisdiction"). Where our discretionary examination of the record as a whole discloses at least a substantial likelihood that jurisdiction exists, however, we have entertained motions to amend. *Compare Carlton,* 751 F.2d at 789 (allowing amendment where "it appears plainly from this record that jurisdiction exists"), *with McGovern v. American Airlines,* 511 F.2d 653, 654 (5th Cir.1975) (rejecting amendment in part because record failed to show that diversity "in all probability exists").

The Nadlers moved to amend their complaint by adding allegations of their citizenship and of AMSC's principal place of business. We granted the motion because the record otherwise evidences a substantial likelihood of diverse citizenship. The allegations of the Nadlers' residence suggests their citizenship in Illinois and Tennessee, and deposition testimony indicates that AMSC's principal place of business lies in Michigan. Given that the complaint alleged AMSC's state of incorporation as Delaware, the record shows a significant probability of complete diversity. We also find the new allegations sufficient to establish diverse citizenship. We thus have subject matter jurisdiction of the case.

## III.

The central legal issue in this appeal concerns the effect of the "reasonable use and natural wear" exception that appears in the surrender covenant. AMSC argues that the phrase modifies both the repair covenant and the surrender covenant and thus absolves it of responsibility for fixing equipment that simply wears out. Because the Nadlers do not dispute that reasonable use and natural wear caused the poor condition of the HVAC system, AMSC concludes, neither covenant requires it to repair or replace the system. The Nadlers assert, on the other hand, that the exception applies only to AMSC's surrender obligation and that the separate repair covenant thus obliged the company to keep the system in good condition throughout the lease term even if reasonable use and natural wear generated disrepair. Given that AMSC does not controvert its failure to maintain the system in good order and condition, they contend, AMSC breached its repair obligation and must compensate them for their costs of replacing the system. Both sides thus claim entitlement to summary judgment.

■ Our interpretation of the covenants leads us to conclude that the parties' dispute regarding the condition of the HVAC system just before the end of the lease term raises a material fact issue that precludes summary judgment for either AMSC or the Nadlers. *See* Fed.R.Civ.P. 56(c). Under Texas law and the peculiar circumstances of this case, we hold that the reasonable use and natural wear exception does not excuse AMSC from repairing equipment that deteriorates from normal wear and tear during the lease term. The exception, in other words, does not significantly modify the repair covenant. Whether AMSC's maintenance efforts satisfied its obligation to repair, however, depends on the condition of the system prior to the expiration of the lease. Because the parties disagree about that critical fact, the record does not provide grounds for summary judgment in favor of either side, and

the district court should not have granted AMSC's motion.

The usual rules of contract interpretation govern our reading of the covenants. The Texas Supreme Court has tersely provided our compass:

In the interpretation of contracts, whether they be ambiguous in the sense that that term is here defined or simply contain language of doubtful meaning, the primary concern of the courts is to ascertain and to give effect to the true intention of the parties. To achieve this object the courts will examine and consider the entire writing, seeking as best they can to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless.

*Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157–58 (1951); *see, e.g., Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 333 (Tex.1983); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) (paraphrasing *Daniel*). Absent ambiguity in the parties' writing, the text of the lease agreement and the circumstances surrounding its execution furnish the only evidence that we may consider of intent. *E.g., Deauville Corp. v. Federated Department Stores,* 756 F.2d 1183, 1193 (5th Cir. 1985) (applying Texas law). Our interpretative task thus consists in discovering the parties' intent through examination of the entire lease agreement and harmonization of each provision.

We see in the words the parties chose a potential conflict. The repair covenant purports unconditionally to require AMSC to keep the HVAC system "in good order and condition" during the lease term. On its face, then, the covenant demands that AMSC repair or replace any equipment that falls below good order and condition before termination of the lease regardless of the cause of the deterioration. The surrender covenant, on the other hand, literally allows AMSC to return the system at the end of the term "in the same condition as when received except for reasonable use and natural wear." Under the terms of the surrender covenant, therefore, if AMSC had

delivered to the Nadlers at the end of the term a heap of stripped nuts and bolts, gnarled sheet metal, shorted-out motors, and blighted condensers, the company would have fully discharged its obligation—so long as reasonable use and natural wear brought about the system's demise. The possibility thus arises that the repair covenant imposes upon AMSC a duty to maintain the property in a condition much better than the condition in which the surrender covenant requires AMSC to return it at the end of the term.

The text and nature of the lease agreement nonetheless impel us to hold that the parties intended just that result. The repair covenant speaks in absolute terms, requiring AMSC "to take good care of the demised premises, ... to keep the same in good order and condition, ... and ... promptly ... [to] make all necessary repairs, ... includ[ing] replacements or renewals ..., [which must] be equal in quality and class to the original work." Nothing in the covenant itself qualifies AMSC's obligation to maintain the property "in good order and condition" by making "necessary" repairs "throughout the term of this Lease", and the reasonable use and natural wear exception appears in the separate surrender covenant. The unconditional tenor of the repair covenant thus suggests that the covenant operates completely independently of the surrender covenant and the exception that the latter contains.

We engage in artificiality, however, if we rest our analysis upon scrutiny of the covenants alone, for the words they employ arguably support a finding that the surrender covenant exception significantly qualifies the lessee's repair obligations. In similar circumstances, in fact, courts have made just that determination. *See Freight Terminals v. Ryder Systems,* 326 F.Supp. 881, 889 (S.D.Tex.1971) (noting, under Texas law, that "a limitation that applied to the 'repair' covenant would also apply to the 'return' covenant"), *aff'd,* 461 F.2d 1046 (5th Cir.1972); *Fisher v. Temco Aircraft Corp.,* 324 S.W.2d 571, 575 (Tex.Civ.App. 1959, no writ) (holding that surrender covenant excepting "natural deterioration and

damage by fire, tornado or other casualty" "could only have been intended to modify, limit, and restrict the obligation of the 'keep in good repair' clause"); *cf. B & B Vending Co. v. Carpenter,* 472 S.W.2d 281, 283 (Tex.Civ.App.1971) (finding that exception of "casualty" excluded responsibility for disappearance of air conditioner through no fault of lessee). We nonetheless believe that the broad rules those cases pronounce take inadequate account of the circumstances that may compel a contrary conclusion in a given case.

This case presents such circumstances. The lease specifies a twenty-year term. It involves a new building. It contemplates commercial use of the property. It requires AMSC to pay a lump sum rental that did not increase during the term, to remit property taxes and all utility charges, and to secure (and pay all premiums on) insurance for damage to the property and for personal injuries occurring on the premises. Another paragraph in the lease, moreover, authorizes the lessors to inspect the property during the term, to demand that the lessee "make any necessary repairs", and, in the event lessee fails to comply, to "enter upon the demised premises and cause such repairs to be made, and charge the cost thereof to Lessee...." We infer from these circumstances, which the lease itself reflects, that AMSC effectively undertook to act as the owner of the property and to make such repairs during the lease term as a reasonably prudent owner would.

The covenants and the other relevant provisions of the lease agreement thus show that the parties intended AMSC to fulfill strictly the obligations that the repair covenant purports to impose. *See generally* M. Friedman, *Friedman on Leases* § 10.6, at 448 (1974) (indicating that meaning of repair covenant derives from "all the relevant circumstances"). Given that the reasonable use and natural wear exception does not significantly diminish AMSC's repair obligation, the repair covenant requires AMSC "to do all that is necessary ... to put the subject premises in good

repair." *In re D.H. Overmyer Co.*, 12 B.R. 777, 787 (Bankr.S.D.N.Y.1981) (interpreting, under Texas law, similar repair covenant). We hold, in other words, that the lease agreement obligates AMSC to repair or replace the HVAC system if it falls below "good order and condition" during the lease term, even if reasonable use and natural wear causes its decline.

Our holding gives effect to both covenants. A contrary finding, in fact, would virtually nullify the repair covenant, making the lessee responsible only for fixing disrepair that arises through its own negligence or other fault. Neither do we ignore the reasonable use and natural wear exception. It continues to acquit AMSC of responsibility for deterioration that does not take the property below "good order and condition" before the end of the lease term.

We emphasize that our determination of the effect of the exception applies only to the facts of this case. We thus may distinguish *Temco Aircraft* on the ground that it involved a lease for only a one-year term. *Freight Terminals* relied solely upon the rule that *Temco Aircraft* established, and, in any event, decision of the case did not require that reliance. *B & B Vending* also concerned a short-term lease, and that agreement involved an old building. The repair covenants in those cases, moreover, imposed a duty to repair less forcefully than the repair covenant in this case does. We interpret only the lease before us, and overly broad rules that those and other cases [2] apply do not materially aid the process.

## IV.

Our interpretation requires us to reverse the summary judgment in AMSC's favor. As we have noted, the parties disagree about the condition of the HVAC system before the end of the lease term. The record shows that it continued to function until the termination of the lease. But the parties differ in their assessments of its efficiency. *See supra* note 1. The question thus arises of whether the system remained "in good order and condition" at the end of the term. If it did, AMSC bears no liability for its repair or replacement. The disagreement thus raises a genuine issue of material fact, and the parties must resolve it through trial.

Because we remand the case for further proceedings, we offer some guidance as to the meaning of "good order and condition". The phrase contemplates an objective standard by which to determine the necessity of repairs. The passage may be rephrased as follows: Lessee must repair or replace property that a reasonably prudent owner would repair or replace. Accordingly, if a reasonably prudent owner would have repaired or replaced the HVAC system before the end of the lease term, AMSC must compensate the Nadlers for the cost of such repairs or replacements. *See Siegler v. Robinson*, 600 S.W.2d 382, 386 (Tex.Civ. App.1980, writ ref'd n.r.e.) ("[T]he landlord is entitled to the reasonable cost of repairs as the proper measure of damages if he waits [to sue] until after the term of the lease has expired."); *Dunlap v. Mars Plumbing Supply*, 504 S.W.2d 917, 918 (Tex.Civ.App.1973, no writ).

## V.

Because the record raises a genuine issue of material fact regarding the condition of the HVAC system, we reverse the summary judgment granted appellees by the District Court and remand the case for further proceedings.

**REVERSED AND REMANDED.**

2. *See, e.g., Orgain v. Butler*, 478 S.W.2d 610, 615 (Tex.Civ.App.1972, no writ) (noting that surrender covenant did not make lessees "insurers" of the property and thus did not make them liable for damage that others caused); *B & B Vending Co. v. Carpenter*, 472 S.W.2d 281, 283 (Tex.Civ. App.1971, no writ) ("[O]ur courts do not favor a construction which would make a lessee an insurer under 'repair' and 'deliver up in good condition' covenants in a lease."); *Hoge v. Lopez*, 394 S.W.2d 816, 818 (Tex.Civ.App.1965, no writ).