872 F.2d 1221
 Bess Caroline MOLETT, Individually and on Behalf of her
minor son, John Dreisch Molett, IV, et al., Plaintiffs,
v.
PENROD DRILLING CO., et al., Defendants.
GEARENCH, INC., Defendant-Third Party Plaintiff-Appellee,
v.
COLUMBUS-McKINNON, INC., Third Party Defendant-Appellant.
 No. 88-4136.
 United States Court of Appeals,
Fifth Circuit.
 May 19, 1989.
 
 Kenneth G. Engerrand, G. Byron Sims, Houston, Tex., for third party defendant-appellant.
 Jeffrey Rhoades, Lafayette, La., for Gearench, Inc.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before THORNBERRY, KING and JONES, Circuit Judges.
 PER CURIAM:
 
 
 1
 This is an appeal from the remand of this case after our opinion in Molett v. Penrod Drilling Co., 826 F.2d 1419 (5th Cir.1987) (Molett I ). At issue for the first time in the litigation is the jurisdiction of the federal courts to adjudicate a claim for indemnity between a defendant and third-party defendant. We conclude that we lack admiralty jurisdiction over the claim in question, but we remand to the district court to allow the third-party plaintiff to amend its complaint to attempt to cure a defect in the allegations of diversity jurisdiction.
 
 BACKGROUND
 
 2
 On January 27, 1983, John Molett, III and Harold E. Landry were killed in an accidental fall while constructing the derrick on a jack-up barge owned by Penrod Drilling Company (Penrod).[1] The rig had been in construction near Vicksburg, Mississippi, but the derrick had to be completed at Belle Chasse, Louisiana, since it otherwise would have been too tall to pass under bridges between Vicksburg and the Gulf of Mexico. Therefore, the contractor had the rig towed to Belle Chasse and subcontracted with McBroom Rig Builders, Inc. (McBroom), who employed Molett and Landry, to finish the derrick.
 
 
 3
 To lift materials to the top of the derrick, Penrod had fabricated a "gin pole." The forty-foot pole was equipped with pulleys and other tackle with one end anchored to the derrick so that the upper end of the pole could be suspended leaning away from the derrick structure and used as a portable stiff-leg crane. It was necessary from time to time to "jump" the gin pole farther up the derrick so that materials could be lifted higher.
 
 
 4
 On the day of the accident, Molett and Landry were standing on a scaffold 147 feet above the rig floor waiting for the gin pole to be raised. As the lift was attempted, the gin pole suddenly broke loose and fell, hitting the scaffold on which the men were standing and sending them and most of their equipment tumbling to the rig floor. In violation of state, federal, and company safety regulations, neither man was wearing a safety line when the accident occurred.
 
 
 5
 After the accident, McBroom employees discovered a chain still hanging from the top derrick beam, almost entirely unwound and missing one hook, and the snatch block intact on the rig floor. The missing hook and any remnant of chain that may have been attached to it were never recovered, evidently having fallen into the river.
 
 
 6
 The survivors of Molett and Landry brought wrongful death actions against Penrod and other companies believed to be the manufacturers of the chain and hook used to lift the gin pole when the accident occurred.[2] Ultimately, it was discovered that the chain bore the trademark of Gearench, Inc., and that the hook was manufactured by Kulkoni, Inc. The complaint was therefore amended to name those companies as defendants guilty of manufacturing defective products. Thereafter, Gearench filed a third-party demand against Columbus-McKinnon, Inc., contending that Columbus-McKinnon had actually manufactured the allegedly defective chain and that Gearench had not contributed in any way to any defect that might have existed. Gearench also sought contribution from Penrod for any liability imposed against it.
 
 
 7
 The case was tried before a jury. On the fourth day of trial, during jury deliberations, Gearench settled with the plaintiff families, paying $1 million to each. While counsel were informing the court of the settlement agreement, the jury sent notice that it had reached a verdict. The trial judge announced that, because a settlement had been reached, he would decide Gearench's third-party claim for indemnity and contribution against Columbus-McKinnon and Penrod. None of the parties objected, and, in the presence of counsel, the judge discharged the jury without obtaining their verdict. The trial judge then proceeded--after argument and briefing--to decide the remaining issues.
 
 
 8
 The district court held that the gin pole fell because the chain by which it had been suspended broke. Although Gearench had sold the chain under its trademark as its own product, the court found that the chain had actually been manufactured by Columbus-McKinnon, that it was unreasonably dangerous in normal use (hence defective), and that the defect caused the accident. The court concluded further that Gearench was unaware of the defect and in no way caused or contributed to the problem. Similarly, Penrod was found blameless for the fact that McBroom employees were working on its vessel without safety lines.
 
 
 9
 In its conclusions of law, the district court held that Gearench's third-party demand against Penrod for indemnity or contribution was governed by 33 U.S.C. Sec. 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA)[3] and that Gearench failed to establish that Penrod had actual knowledge of a dangerous condition leading to the decedents' deaths or was aware that McBroom was unreasonably failing to protect its employees from such a condition.[4] It therefore rejected Gearench's claim against Penrod.
 
 
 10
 The court next concluded that Columbus-McKinnon, as the actual manufacturer of a defective product that caused the deaths, was strictly liable in tort for the damages under either Louisiana or maritime law. Consequently, Gearench was entitled to indemnity from Columbus-McKinnon. The court did not rule on the reasonableness of the amount paid in settlement.
 
 
 11
 In Molett I, Columbus-McKinnon appealed from the indemnity judgment against it. Gearench appealed from the judgment denying indemnity and contribution from Penrod only to the extent that this Court did not uphold its right to full indemnity from Columbus-McKinnon. We held that Gearench's claim for indemnity or contribution against Columbus-McKinnon was not governed by maritime law because that claim lacked any traditional maritime flavor. 826 F.2d at 1428. However, the Court upheld Gearench's right to indemnity from Columbus-McKinnon under Louisiana law and remanded the case only for findings of fact regarding the reasonableness of the settlement under Louisiana law. 826 F.2d at 1428-29.
 
 
 12
 On remand, the district court determined that the full amount of the settlement was reasonable. Columbus-McKinnon now appeals from the judgment on remand contending: (1) that the federal courts lack jurisdiction since diversity of citizenship was never proven and admiralty jurisdiction was rejected in Molett I; (2) that the district court made insufficient findings of fact to support the reasonableness of the settlement award; and (3) that it should not be liable for indemnity because Gearench did not raise the defense of prescription below and did not make a tender of defense until after the settlement was reached. Columbus-McKinnon never contested the federal court's jurisdiction initially or on remand to the district court, or when it appeared previously before this court.
 
 
 13
 Jurisdiction is the key question before us. There are two paths to jurisdiction over the indemnity case on remand. The first would trace from the original plaintiffs' claims and would be predicated on admiralty or diversity in their original action. The second finds diversity between Gearench and Columbus-McKinnon, the admiralty nature of their dispute having previously been ruled out by Molett I. We shall address the theories in this order.
 
 I. ADMIRALTY JURISDICTION
 
 14
 This Court might assert jurisdiction over Gearench's indemnity claim if: (1) the district court had admiralty jurisdiction over plaintiffs' claims against Penrod, and (2) plaintiffs' claims against Gearench, though not admiralty based, were nevertheless within the district court's pendent jurisdiction, and (3) Gearench's third-party claim against Columbus-McKinnon was within the district court's ancillary jurisdiction. We do not here venture beyond the first of these conjunctive steps.
 
 
 15
 The plaintiffs' original complaint alleges in part that Penrod was liable for fabricating the derrick so as to require an unsafe method of erection; failing to design the derrick so that it could be safely assembled; furnishing improper or defective equipment, the gin pole; and allowing an improper and negligent method of assembly of the derrick to occur. Jurisdiction was asserted under 28 U.S.C. Sec. 1333 and 33 U.S.C. Sec. 905(b) of the LHWCA. These claims were not specifically at bar when the court in Molett I held that the plaintiffs' products liability claim against the chain manufacturer and Gearench's related claim for indemnity were not maritime torts. We must therefore decide whether the plaintiffs' Sec. 905(b) claim against Penrod is sufficient to invoke this court's admiralty jurisdiction.
 
 
 16
 Guided by the Supreme Court's holdings in Executive Jet Aviation v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) and Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), this Circuit applies a two-part inquiry to determine the existence of maritime jurisdiction. "That inquiry is essentially fact-bound, turning on a determination of the location of the tort, the situs factor, and the pertinent activity, the nexus factor." Richendollar v. Diamond M. Drilling Co., 819 F.2d 124, 127 (5th Cir.1987) (en banc). Because Molett's and Landry's deaths occurred on navigable waters, only the nexus prong must be satisfied here.
 
 
 17
 To satisfy the nexus factor, the "wrong [must] bear a significant relationship to traditional maritime activity." Executive Jet, 409 U.S. at 268, 93 S.Ct. at 504. In Kelly v. Smith, 485 F.2d 520 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), this court outlined four factors to consider in assessing whether the nexus requirement has been met: (1) the functions and roles of the parties, (2) the types of vehicles and instrumentalities involved; (3) the causation and type of injury; and (4) traditional concepts of the role of admiralty law. Id. at 525. Before analyzing the present "wrong" in light of these factors, we pause to review case law from this circuit addressing maritime jurisdiction over claims arising from injuries sustained on vessels under construction.
 
 
 18
 Relying on Lundy v. Litton Systems, Inc., 624 F.2d 590, (5th Cir.1980), reh'g denied, 629 F.2d 1349, cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981) and legislative history, this court concluded that a claim properly stated under 33 U.S.C. Sec. 905(b) of LHWCA constituted an implicit finding of admiralty jurisdiction. Hall v. Hvide Hull No. 3, 746 F.2d 294, 300 (5th Cir.1984), reh'g denied, 753 F.2d 1075 (1985) (en banc). The difficult question in Hall and Lundy was whether a partially constructed vessel floating in navigable waters constituted a vessel under LHWCA and was therefore sufficient to form the basis of a Sec. 905(b) claim. In Hall, once vessel status was determined, a finding of maritime jurisdiction immediately followed.
 
 
 19
 We have since rejected the notion that merely stating a Sec. 905(b) claim is sufficient to establish maritime jurisdiction. See Richendollar, 819 F.2d at 125. Following Richendollar and May v. Transworld Drilling Co., 786 F.2d 1261, 1263 (5th Cir.), cert. denied, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986), our circuit clearly requires that maritime jurisdiction be satisfied in addition to establishing a Sec. 905(b) claim. Thus, unlike the jurisdictional analysis in Hall which focused on vessel status under LHWCA, after Richendollar "the configuration of the watercraft is of secondary importance." Maritime jurisdiction can only be established by satisfying Executive Jet 's two-part situs and nexus requirement. Hall and Lundy are therefore no longer viable precedents with regard to jurisdiction.
 
 
 20
 By contrast, this court's decision in Lowe v. Ingalls Shipbuilding, Inc., 723 F.2d 1173 (5th Cir.1984) remains unscathed by Richendollar. The question in Lowe was whether a shipyard employer could establish an independent claim for indemnity against an asbestos manufacturer. Before reaching this issue, the court sua sponte determined that subject matter jurisdiction was lacking. In dismissing maritime jurisdiction as a possible jurisdictional basis, the court focused on Executive Jet 's nexus or maritime activity factor. The court concluded that "[i]t has long been held that ... ship construction is [not] a maritime activity" even if the incomplete vessel is lying in navigable waters. Lowe, 723 F.2d at 1185. Based on this conclusion, the court noted that
 
 
 21
 where the tort was previously maritime only because of situs, the only activity being nonmaritime, Executive Jet now requires that the tort be considered nonmaritime. Thus, in the post-Executive Jet era we have held that an injury to a ship construction worker on board a ship under construction and lying in navigable waters is not a maritime tort.
 
 
 22
 Id. at 1187 (emphasis added).
 
 
 23
 While Lowe 's general finding that admiralty jurisdiction does not inhere in claims brought by ship construction workers for injuries sustained on partially completed vessels may require us to hold that the plaintiffs' claims against Penrod lack maritime flavor, we prefer to treat Lowe as a backdrop to the detailed analysis Kelly requires us to undertake. Mindful of Lowe we turn to the Kelly factors.
 
 1. The function and roles of the parties
 
 24
 Molett and Landry were land-based construction workers. Citing Lowe, the court in Molett I recognized that neither ship construction nor derrick building "has traditionally been considered a maritime business." Molett I, 826 F.2d at 1426. Furthermore, the fact that the plaintiffs' claims were brought against Penrod, a vessel owner, is not alone sufficient to afford maritime jurisdiction over the alleged tort. At the time of the accident, Penrod's role and function involved neither the vessel's navigation or maritime commerce. On balance, Kelly 's first factor points strongly against finding a maritime nexus.
 
 
 25
 2. The vehicles and the instrumentalities involved
 
 
 26
 Molett I is controlling on this factor. There the count found that
 
 
 27
 [a]lthough the vehicle upon which the accident occurred was a drilling barge, that fact is at most tangential. The barge was not complete or in navigation when the accident occurred, and the accident neither caused harm to the barge nor can be specifically attributed to the location of the derrick on the vessel. Moreover, as noted above, the chain used was of a type predominantly employed for nonmaritime purposes. Neither the vehicle nor the instrumentalities involved, therefore, raise considerations creating a significant nexus to traditional maritime activities.
 
 
 28
 Id. at 1427. The vehicles and instrumentalities in the present case are the same as those in Molett I. Our law of the case doctrine requires that we find the maritime nexus lacking with respect to this factor. See also Watson v. Massman Construction Co., 850 F.2d 219, 223 (5th Cir.1988) (holding that, despite the presence of a barge in navigable water which contributed to the death of a construction worker, the "vehicles and instrumentalities" factor did not support a finding of maritime nexus).
 
 3. The causation and type of injury
 
 29
 Molett I similarly governs the outcome of this factor. There the court noted that "[e]very factor identified as a cause of the accident might have occurred as easily on land, and the injuries the parties suffered are indistinguishable from those arising out of similar land-based mishaps." Molett I, 826 F.2d at 1427 (emphasis added). Molett I considered "every factor," not just those limited to the products liability and related indemnity claim. Notwithstanding Molett I 's sweeping analysis, we independently find it of no overriding importance that the plaintiffs' have alleged as the cause of the accident the negligence of the vessel owner. Clearly, Molett and Landry's fall from the scaffold could have as easily occurred while in the Vicksburg shipyard.
 
 
 30
 4. Traditional concepts of the role of admiralty law
 
 
 31
 In Molett I, the court pronounced that "traditional concepts of the role of admiralty law do not justify treating this accident as a maritime tort." Id. (emphasis added). This statement, while arguably limited to the context of the plaintiff's products liability claim and Gearench's indemnity claim, may be broad enough to dispose of the present Sec. 905(b) claim. However, we need not rely on the scope of Molett I 's language. Rather, even a de novo review of Kelly 's fourth factor militates against a finding of maritime nexus. The matters with which admiralty jurisdiction has been traditionally concerned were articulated by the Supreme Court in Executive Jet:
 
 
 32
 That law deals with navigational rules--rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.
 
 
 33
 Executive Jet, 409 U.S. at 270, 93 S.Ct. at 505. While the very heart of maritime jurisdiction is the protection of maritime commerce, the Supreme Court has recognized that this underlying purpose cannot be adequately effectuated by restricting jurisdiction to "those individuals actually engaged in maritime commerce." Rather, "this interest can be fully vindicated only if all operators of vessels on navigable waters are subject to uniform rules of conduct." Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). Thus, providing uniform navigational rules in addition to protecting maritime comerce has emerged as a central concern underlying the exercise of maritime jurisdiction. Gearench has failed to establish that the plaintiffs' Sec. 905(b) claim against Penrod gives rise to an overriding concern to establish uniform rules to protect maritime commerce or navigational rules. As Richendollar made abundantly clear, merely cloaking claims in Sec. 905(b) garb will no longer tote the jurisdictional baggage.
 
 
 34
 In light of the Kelly factors, the Lowe holding, and Molett I, we hold that the district court did not have admiralty jurisdiction over the plaintiffs' claim against Penrod and therefore could not have exercised ancillary jurisdiction over Gearench's third-party claim. The only remaining basis for jurisdiction lies in the possibility of establishing diversity.II. DIVERSITY JURISDICTION
 
 
 35
 Diversity jurisdiction may be approached from two angles: by analyzing diversity in plaintiffs' original claims or in the claims asserted by Gearench against third-party defendants including Columbus-McKinnon. Diversity at either level will suffice to maintain federal jurisdiction. See Illinois Cent. Gulf R. Co. v. Pargas, Inc., 706 F.2d 633 (5th Cir.1983).
 
 
 36
 Like every other aspect of this case, however, the inquiry into diversity is not straightforward, in part because the party claiming federal jurisdiction has the burden of proving the existence of jurisdiction, Pettinelli v. Danzig, 644 F.2d 1160, 1162 (5th Cir.1981). When jurisdiction depends on citizenship, citizenship must be "distinctly and affirmatively alleged," McGovern v. American Airlines, Inc., 511 F.2d 653, 654 (5th Cir.1975). Yet, the allegations in plaintiffs' complaints and Gearench's third-party complaint are insufficient to establish diversity jurisdiction.
 
 
 37
 In their original complaint, plaintiffs alleged that they were citizens of Alabama and Louisiana and that the original defendants were corporations organized under the laws of states other than Alabama and Louisiana and with their principal places of business in states other than Alabama and Louisiana. Plaintiffs' amendments by which they later joined other defendants are similarly conclusory. These diversity allegations are defective because they do not identify the states of incorporation of the defendant corporations or their principal places of business. 28 U.S.C. Sec. 1332(c); see also Fed.R.Civ.P. 84 and official Form 2(a) appended thereto. Compare Leigh v. National Aeronautics and Space Admin., 860 F.2d 652 (5th Cir.1988). The third-party complaint of Gearench against Columbus-McKinnon, later amended to add Naniwa Tekko K.K. and K-M International, does not allege any jurisdictional basis, apparently assuming the ancillary nature of Gearench's claim to plaintiffs' lawsuit.
 
 
 38
 There is a further problem. Ordinarily, the existence of diversity jurisdiction is determined at the commencement of the lawsuit, such that subsequent occurrences will not divest the court of subject-matter jurisdiction. Carlton v. BAWW, Inc., 751 F.2d 781, 785 (5th Cir.1985). An important qualification to this rule must be made if a nondiverse defendant is later added, for this destroys complete diversity and has been held to defeat jurisdiction. Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978); Hensgens v. Deere & Co., 833 F.2d 1179 (5th Cir.1987). In this case, plaintiffs added and dropped defendants sporadically throughout the litigation prior to final judgment.[5] Gearench itself was substituted as a defendant for Armco Steel. We do not know whether one or more of these short-term defendants may have been nondiverse. Further, in the absence of briefing or any knowledge of the facts, we decline to speculate on the jurisdictional consequences of such events.
 
 
 39
 Even if plaintiffs' diversity with their multitude of defendants is not resolved in favor of jurisdiction, there remains possible complete diversity between Gearench and the parties against which it asserted claims.[6]
 
 
 40
 Despite these undeniable complexities, we need not dismiss the case, because 28 U.S.C. Sec. 1653 provides that: "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." Our Court has repeatedly stated that Sec. 1653 is to be construed liberally. See, e.g., Carlton, 751 F.2d at 789; McGovern, 511 F.2d at 654. Where jurisdiction is clear from the record, this Court has allowed direct amendments to the pleadings without a remand. Carlton, 751 F.2d at 789; Sheehan v. Army and Air Force Exchange Serv., 619 F.2d 1132, 1137 n. 7 (5th Cir.1980), rev'd on other grounds, 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); Niagara Fire Insurance Co. v. Dyess Furniture Co., 292 F.2d 232, 233 (5th Cir.1961). In Nadler v. American Motors Sales Corp., 764 F.2d 409, 413 (5th Cir.1985), this Court allowed amendment on appeal based on a showing that "the record on the whole discloses a substantial likelihood that jurisdiction exists." (Citing Carlton, 751 F.2d at 789).
 
 
 41
 Where, as here, jurisdiction is not clear from the record, but there is some reason to believe that jurisdiction exists, the Court may remand the case to the district court for amendment of the allegations and for the record to be supplemented. Strain v. Harrelson Rubber Co., 742 F.2d 888, 889-90 (5th Cir.1984); Freeman v. Northwest Acceptance, 754 F.2d 553 (5th Cir.1985); American Motorists Insurance Co. v. American Employers' Insurance Co., 600 F.2d 15 (1979). Accord Sarnoff v. American Home Products Corp., 798 F.2d 1075, 1079 (7th Cir.1986) (remand to allow parties to introduce evidence and to obtain a jurisdictional finding); Stockman v. LaCroix, 790 F.2d 584, 587 (7th Cir.1986) (appellate court allowed the parties to supplement the record on appeal with affidavits even though the record was devoid of jurisdictional proof).
 
 
 42
 In Strain, 742 F.2d at 889 n. 1, this Court carefully reviewed the record, concluding that "we find nothing in the record that establishes the existence of diverse citizenship." Yet, the Court went on to decide that dismissal of the case was not required. The Court remanded the action to the district court for a determination of whether jurisdictional grounds existed. Id. at 889-90. In Freeman, 754 F.2d at 560, a remand was also allowed since "other evidence may cast a different factual light on the citizenship of any or all of the parties."
 
 
 43
 Columbus-McKinnon distinguishes Strain and Freeman by asserting that this case is one in which jurisdiction was contested and in which the party bearing the burden of proof then failed to elicit any evidence supporting jurisdiction. We disagree. Gearench had no notice, nor should it be charged with any notice, of a defect in jurisdiction prior to this second appeal. In the original action, plaintiffs alleged not only diversity jurisdiction, but also admiralty jurisdiction based upon Sec. 905(b) and general maritime negligence claims. The diversity of the parties was never materially at issue. Columbus-McKinnon concedes that as part of the pre-trial order "the parties stipulated that jurisdiction and venue of the case were based on: General Maritime Law, pendent state claims asserted by plaintiffs versus various defendants." Our previous discussion of the confusion in our own admiralty precedents is enough to demonstrate that it was not unreasonable for Gearench to have assumed that admiralty jurisdiction existed at least over plaintiffs' claims against Penrod.
 
 
 44
 Furthermore, Gearench was a defendant to the original action. As such, it had no burden to prove diversity between the original parties or between it and its third-party defendants assuming ancillary jurisdiction existed. Our decision in Molett I dealt only with the lack of admiralty jurisdiction over Gearench's cross-claim, and the issue was really what law would apply to that claim. As we have stated earlier, that is not dispositive of admiralty jurisdiction over plaintiffs' claims against Penrod. Our decision that focused on what law to apply to the indemnity claim should not necessarily have alerted Gearench that the jurisdiction of the court itself was at issue. Indeed, on remand, Columbus-McKinnon did not challenge the jurisdiction of the district court. Only now is there argument that admiralty jurisdiction might not exist and that the allegations of diversity are defective.
 
 
 45
 Recently, we reversed and remanded the dismissal of a claim in which the plaintiff alleged that the corporate defendant was domiciled in a diverse jurisdiction but omitted identifying its principal place of business. Leigh, supra. Both facts are required to establish diversity of citizenship under 28 U.S.C. Sec. 1332(c). The defendant admitted its state of incorporation, but there was no evidence concerning the principal place of business. We held:
 
 
 46
 [G]iven that diversity jurisdiction was not questioned by the parties and there is no suggestion in the record that it does not in fact exist, [plaintiff] should at least be given the opportunity to amend his complaint to make a more complete statement of the court's diversity jurisdiction....
 
 
 47
 Leigh, 860 F.2d at 653-54. We find this reasoning dispositive.
 
 
 48
 We therefore VACATE the district court's judgment and REMAND to ascertain the existence of diversity jurisdiction.
 
 
 49
 EDITH H. JONES, Circuit Judge, concurring and dissenting:
 
 
 50
 I concur in the decision to remand this case to the district court for the purpose of exploring diversity jurisdiction. With due respect to the majority, however, I cannot agree that the federal courts lacked admiralty jurisdiction over the plaintiffs' claims against Penrod.[1] An essential function of our admiralty responsibility is undercut by the majority's holding that allegations of negligence against a navigable jack-up barge lying in navigable waters lack a "maritime nexus" sufficient to invoke admiralty jurisdiction.
 
 
 51
 The majority's reasoning follows three mutually interdependent lines. First, it is asserted that our circuit's prior authorities do not permit the assertion of admiralty jurisdiction over a claim by a ship construction worker against a partially completed vessel. Second, the majority purport to disavow admiralty jurisdiction based on the Executive Jet[2] test as supplemented by our decision in Kelly v. Smith.[3] Third, the majority place significant weight upon the previous panel holding in this case, either as a matter of stare decisis or law of the case. I shall respond to these points in reverse order.
 
 
 52
 Despite its perhaps over-broad wording, Molett I does not resolve the federal courts' jurisdiction over plaintiffs' claims against Penrod. While that opinion refers generally to "the accident" in its analysis of the Executive Jet maritime nexus test, the Molett I panel was specifically considering Gearench's and Columbus-McKinnon's roles in the accident, and its ruling was that Gearench's third-party cross-claim against Columbus-McKinnon was not grounded in admiralty. 826 F.2d 1428. Molett I stated that "[t]he fatal accident had no greater impact on maritime commerce than if it had occurred while the derrick was being erected in the Mississippi ship yard." 826 F.2d at 1426. Yet, in the same paragraph, it recognized that the question was whether "the role in the accident attributed to Gearench and Columbus-McKinnon creates [a] substantial maritime nexus." The relevant portion of the opinion concluded that "Molett's and Landry's product liability claims and Gearench's related claim for indemnity, therefore, are governed by Louisiana law." Id. at 1428 (emphasis added). As Executive Jet requires, 93 S.Ct. at 501, and Molett I recognizes, 826 F.2d at 1426, maritime jurisdiction applies if the wrong bears a significant relationship to traditional maritime activity. That the wrong asserted by plaintiffs against Gearench was a products liability claim does not ipso facto prevent the wrongs they asserted against Penrod from being maritime torts.[4]
 
 
 53
 Because Molett I is not decisive, the majority's Executive Jet-Kelly analysis is left largely rudderless. The majority go on, however, to make some extraordinary and, I believe, unprecedented extensions of the Executive Jet holding. I must agree with their observation that the alleged involvement of Penrod's vessel in the accident "is not alone sufficient to afford maritime jurisdiction over the alleged tort." Majority Opinion at 11-12. Compare Foremost Insurance Co. v. Richardson, 102 S.Ct. at 2657-59. But the majority continue: "At the time of the accident, Penrod's role and function involved neither the vessel's navigation or maritime commerce." Observing that "Molett and Landry's fall from the scaffold could have as easily occurred while in the Vicksburg shipyard," they find it "of no overriding importance that the plaintiffs have alleged as the cause of the accident the negligence of the vessel owner." (emphasis added) The majority characterize Foremost as adding to Executive Jet 's analysis of maritime flavor only the requirement that federal courts fashion uniform navigational rules for operators of vessels. If, as the majority say, the "very heart of maritime jurisdiction" is "the protection of maritime commerce," should not admiralty be concerned with standards of care owed by a commercial, navigable, floating vessel to those who come aboard? Surely the protection of maritime commerce requires that commercial vessel owners be subject to a uniform, predictable body of law as their craft move from state to state. Uncertainty not only spawns litigation difficulties, like those retrospectively found in this case, but it also drives up insurance costs for vessel owners.
 
 
 54
 The majority's error, I believe, lies in their interpretation of Foremost. That Supreme Court case held admiralty jurisdiction extant over a collision between two small pleasure craft on a minor Louisiana river. The Court found a sufficient "maritime nexus" under the Executive Jet test because the wrong involved negligent operation of a vessel upon navigable waters. 102 S.Ct. 2658. Foremost was a quintessentially pragmatic decision, explicitly guided by two policies: that the federal interest in promoting maritime commerce can only be fully vindicated if all vessel operators on navigable waters are subject to uniform rules of conduct; and that inconsistency and uncertainty would flow from imposing different standards of liability on vessel owners from jurisdiction to jurisdiction. 102 S.Ct. 2658-59. Those twin policies dictate even more forcefully the need to apply admiralty jurisdiction and maritime tort principles to the standard of care owed by this commercial jack-up barge, which had already been towed from Vicksburg, Mississippi to Belle Chasse, Louisiana.[5] Compare Executive Jet, 93 S.Ct. at 505 ("Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy ...").
 
 
 55
 The only sensible basis for denying admiralty jurisdiction that I can see in light of Foremost is that this vessel was under construction and not yet in maritime commerce. Our precedents might be read to reject admiralty jurisdiction for injuries that arise on ships under construction. In Hollister v. Luke Construction Co., 517 F.2d 920 (5th Cir.1975), this court declined to apply maritime tort principles to an injury of a shipbuilder whose employer, a welding company, was allegedly negligent. The injury there occurred aboard a launched but incomplete vessel. Relying largely on Hollister, Lowe v. Ingalls Shipbuilding, a Division of Litton, 723 F.2d 1173 (5th Cir.1984) rejected an indemnity claim made by a shipyard owner against manufacturers of asbestos for injuries suffered by ship construction and repair employees. The court held that the underlying tort liability of the manufacturers for the employees' asbestos exposure claims, which could not even be definitively shown to have a maritime situs, was not based on maritime law. Neither of those cases asserted negligence directly against the vessel owner, however.[6]
 
 
 56
 Our Sec. 905(b) cases, such as Richendollar v. Diamond M Drilling Co., 819 F.2d 124, 126 (5th Cir.) (en banc), cert. denied, --- U.S. ----, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987), and May v. Transworld Drilling Co., 786 F.2d 1261, 1263 (5th Cir.), cert. denied, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986), hold only that such a claim must independently satisfy admiralty jurisdiction. None of those Sec. 905(b) cases construed the maritime nexus prong of Executive Jet at issue here. See Engerrand, Admiralty Law Survey, 23 Tort & Ins. L.J. 251 (1988). Nor does any of those decisions contradict the principle I advocate: I see no necessary inconsistency between our previous cases rejecting admiralty jurisdiction on their particular facts, while holding it applicable to a case, like this one, in which a commercial vessel was navigational, although not yet completely built, and plaintiff has alleged vessel negligence.
 
 
 57
 The majority's holding is unfortunately not so confined. Had Molett and Landry been carpetlayers, called aboard a commercial vessel moored between voyages, the majority's decision would cast doubt on the propriety of admiralty jurisdiction. The majority's broad language also suggests that admiralty jurisdiction might not be present if a crewmember's personal friend, come aboard during a stop in port, slipped and fell on a ship's staircase. The accident could have as easily occurred on land; there would be no connection between it and navigation or maritime commerce. This result, however, would squarely conflict with Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), the seminal Supreme Court decision on principles of vessel liability toward non-crewmembers.[7]
 
 
 58
 Limiting admiralty jurisdiction over a vessel's negligence to injuries that involve navigation or maritime commerce seems to me an unnecessary invitation to a chaotic round of expository litigation. There is no doubt that Executive Jet has left us sailing uncharted seas of admiralty jurisdiction. I cannot, however, accept the majority's suggestion that Executive Jet 's maritime nexus requirement potentially exposes commercial vessel owners to liability under state law for injuries that occur aboard their navigationally-capable, floating vessels. I respectfully dissent.
 
 
 
 [1]
 The description of the background of this litigation borrows heavily from our earlier opinion in Molett I. 826 F.2d at 1421-23
 
 
 [2]
 The contractor and other parties were also named in the suit
 
 
 [3]
 33 U.S.C. Secs. 901-950 (1982)
 
 
 [4]
 See Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); Helaire v. Mobil Oil Co., 709 F.2d 1031, 1035-40 (5th Cir.1983)
 
 
 [5]
 The court on remand need not evaluate cross-claims or counter-claims in regard to the diversity of citizenship between such parties and the plaintiffs. See Owen Equip., supra, 437 U.S. at 376, 98 S.Ct. at 2403 (observing that ancillary jurisdiction exists over such claims if the principal claims in suit satisfy federal jurisdictional standards)
 
 
 [6]
 Gearench, as noted, impleaded Columbus-McKinnon, Naniwa Tekko K.K., and K-M International. Gearench also filed cross-claims against parties who had previously been joined in the suit, including Penrod. It will be incumbent on Gearench to establish complete diversity between itself and all of these parties on remand, inasmuch as we are here analyzing the Gearench claims as if filed in a separate lawsuit requiring a self-sustaining jurisdictional basis. Cf. Owen Equip., supra, n. 13
 
 
 [1]
 Suffice it to say that if such jurisdiction existed, I would conclude that the claim between Gearench and Columbus-McKinnon was ancillary to the plaintiffs' admiralty claim and thus within the court's jurisdiction
 
 
 [2]
 Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)
 
 
 [3]
 Kelly v. Smith, 485 F.2d 520 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974)
 
 
 [4]
 The plaintiffs' original complaint alleges in part that Penrod fabricated the derrick in an unsafe manner; failed to design the derrick so that it could be safely assembled; furnished improper or defective equipment; and allowed improper and negligent methods of derrick assembly
 
 
 [5]
 Indeed, no party at the original trial, on appeal, or on remand ever questioned the admiralty basis for jurisdiction over this claim
 
 
 [6]
 A claim was made by an employee against his employer, the builder of a launched vessel undergoing sea trials, in Williams v. Avondale Shipyards, Inc., 452 F.2d 955 (5th Cir.1971). In that pre-Executive Jet case, Judge Brown held that maritime law governed as a matter of situs. 452 F.2d at 959
 
 
 [7]
 That Kermarec remains valid would seem uncontestable, because the Court cited it as the basis for redefining a vessel owner's liability to workers covered by the LHWCA in Scindia Steam Nav. Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981)